# THE SHAWMUT MINING COMPANY

## *vs.*

## ROBERT J. PADGETT.

*Partnership : common talk.   Attorney and client : privileged*
*communications.*

Evidence that it was the common talk that "B." was a part-
ner of "L.' is inadmissible to prove the partnership, unless it
was shown that such statements had been brought to the knowl-
edge of "B."                                              p. 399

The privilege resulting from communications between attor-
ney and client is designed to secure the client's confidence in
the secrecy of such communications; it assumes that the com-
munications were made with the intention of confidentiality;
the moment the confidence ceases the privilege ceases.    p. 404

Such privilege being for the protection of the client, it is
one that may be waived; this may be done by implication, and
if the client discloses as much as he pleases, he can not withhold
the remainder.                                            p. 404

*Decided April 2nd 1918.*

Appeal from the Baltimore City Court.   (HEUISLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE,
JJ.

*George Moore Brady* (with whom was *William Milnes Maloy* on the the brief), for the appellant.

*Vernon Cook* and *Enos S. Stockbridge* (with whom were *France, McLanahan and Rouzer* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment for the defendant, Robert J. Padgett, in an action brought by the appellant, the Shawmut Mining Company, against William J. Llewellyn and Robert J. Padgett, co-partners trading as William J. Llewellyn & Company.

The suit or action was brought upon the common money counts; but an account was filed with the declaration showing that the claim sued on was for bricks sold by the plaintiff to William J. Llewellyn & Company.

The defendant, Padgett, filed three pleas, (1) that he never was indebted as alleged; (2) that he did not promise as alleged; (3) that he was not co-partner of William J. Llewellyn, trading as William J. Llewellyn & Company, as alleged in the declaration. The defendant, William J. Llewellyn, declined to plead, and later, in open court, confessed judgment in favor of the plaintiff upon the claim filed.

In the course of the trial there were thirty-five exceptions taken to the rulings of the Court upon the evidence, and one upon the prayers.

William J. Llewellyn, being produced by the plaintiff, testified as to the co-partnership agreement. In the course of his testimony he was asked: "Was there any writing between you?" and he answered: "None whatever; Padgett did not want any writing." The defendant asked the Court to strike out this answer unless "the witness means to say that Mr. Padgett said so." There was no explanation given as to his meaning, and the answer was stricken out. This forms the first exception. In this ruling of the Court we discover no

error.   The Court's ruling on the second exception was also proper.

The third exception was to Llewellyn's statement that it was the common talk of Baltimore that Bob Padgett was his partner.   This general, indefinite statement, not shown to have been brought to the knowledge of the defendant, was properly excluded.

The fourth exception is to the admissibility of a ledger of William J. Llewellyn & Company offered in evidence by the defendant.   This evidence may not have been material, but in its admission we find no reversible error.

The witness Llewellyn was, at the time he testified, a manufacturer's agent, with his offices in the City of New York.   He had the agency for the sale of the goods of the St. Mary's Sewer Pipe Company and the Shawmut Mining Company.   These agencies he had held since he left Baltimore, in 1914.   In his examination in chief he testified, as we have said, to the existence of an oral co-partnership agreement between him and Robert J. Padgett, by which the firm of W. J. Llewellyn & Company, consisting of Robert J. Padgett and himself, was created.   He further testified that the affairs of the firm were managed by the witness, and the profits were equally divided between him and Padgett; that Padgett's share of the profits was paid to him in cash.   The firm was engaged in the sale of bricks, cement, etc., and was agent for the Shawmut Mining Company and for the sale of the Alpha Portland Cement.   The co-partnership agreement was made, as he stated, in May, 1908, and shipment of goods to the firm started September, 1909, and ceased September, 1911.   Thereafter, in January, 1912, a corporation was formed, known as the Contractors' Supply Company, with W. J. Llewellyn as president and general manager.   The books of the company did not show Padgett's connection with the firm, or that he shared in the profits of the company.   This, as witness said, was in accord with the wishes of Padgett.

Upon cross-examinatoin, Llewellyn testified that Padgett would never receive a check for his profits. He always took to him the cash. There was no regular time at which these settlements were made. "The account would be on a piece of paper, so much cement sold to this party, so much brick sold to this party; that Padgett would look at the account, and, after receiving the money, would tear it up; that he took no receipts from Padgett and made no entries on the firm's books." The money for goods sold by the firm was collected by Llewellyn, and the deposits in the bank were made subject to withdrawal by him only.

The witness was then asked: "Can you explain how you were so much behind?" He replied that the money was used to further the political interest of Robert J. Padgett; that he himself gave to Padgett, in addition to his share of the profits, large sums of money for such purposes. The witness was then asked: "When did you leave Baltimore?" "I went in 1913. * * * I have been living in New York now a little over two years." "When did you leave for good?" "I left in 1914, in the month of March." Question. "Did you leave Baltimore in December, 1913?" Answer. "Why, sure. I left several times. I left in December, 1913, with a $4,000.00 check in my pocket, certified to the order of the St. Mary's Sewer Pipe Company, to pay a debt for which I was obligated." Question. "Did you leave rather suddenly?" Answer. "No." "You did not say good-bye to any of your friends, did you?" "I told William Corey." Question. "Anybody else?" "I told my wife." Question. "You got another check cashed just before you left?" To this question the plaintiff's counsel objected, saying: "What has that to do with the case?" As the record disclosed, the witness voluntarily said: "It has to do with the Llewellyn case—that is, the Contractors' Supply Company. I will acknowledge taking money there. I will acknowledge that." Then followed a discussion as to the question asked, participated in by the Court, as well as the counsel for the respective parties.

At its conclusion the Court said, addressing the defendant's counsel: "If any of your questions broach upon his private affairs not connected with this matter, he has the right to refuse to answer." The counsel for the defendant, dropping the question to which objection had been made, asked the witness: "What do you mean by that acknowledgment?" This question was objected to by the plaintiff's counsel and, the objections being overruled, the fifth exception was taken thereto.

It will be observed that this question was directed to the answer of the witness, voluntarily made, in which he said: "I will acknowledge taking money there. I will acknowledge that." The witness answered the question objected to, saying that "on the same day that I had this $4,000.00 check certified I also drew the payroll of the Contractors' Supply Company, and also drew a check to my order, W. J. Llewellyn, for thirteen hundred dollars." This answer, given in explanation of the earlier answer of the witness, which was uncertain in its meaning, was not objected to, and the witness was permitted, without objections, to state further that he put the money in his pocket and went to his home, and that night he went to New York, from which place he returned to Baltimore on the 20th of December, and after remaining in Baltimore for about two days, again went to New York, and in the latter part of the year 1914 ceased to make his home in Baltimore. The plaintiff's counsel proceeding with the examination asked: "This $1300.00 you took"—here the witness interrupted him, saying: "Was the stock—I will finish that for you—was the stock of the Contractors' Supply Company which I was entitled to." Question. "Did you tell anybody you were going to take it?" Answer. "I resigned on that date." Question. "Then you took the money and went off with it?" Answer: "I took it and got the money, cash." "Well, now, Mr. Llewellyn, isn't it a fact, for a long time afterward you were afraid to come to Baltimore for fear you would be arrested?" "No; I was here

all the time." He was back in the office the following Wednesday. He did not fear arrest. The witness was then asked: "Isn't it fact, with regard to the $1300.00 check, that you got that check signed in Baltimore by Mr. Corey, as secretary of the company, representing to him that it was to be used for payroll, and that you then, instead of using it for payroll, used it for your own personal benefit?"

This question was objected to, and the Court thereupon struck from the question the words, "and that you then, instead of using it for the payroll, used it for your own personal benefit"; and the question, as amended, was propounded to the witness. The plaintiff again objected and the Court overruled his objection. This forms the sixth exception.

He replied, in substance, saying there were two or three checks, drawn in blank, signed by William H. Corey, an officer of the corporation authorized to sign checks. He could not recall whether he had demanded his check of $1300.00 or not; that he asked Miss Thompson, an employee in the office, to fill in a check to the St. Mary's Sewer Pipe Company, but she refused, saying, "They" (meaning others interested in the company) "did not want her to." He then filled in the check himself, for the sum of $4,000.00 to St. Mary's Sewer Pipe Company, and also filled in another to himself, W. J. Llewellyn, for $1300.00; that the representations made to Corey to have him sign the checks were those ordinarily made—that is, that he wanted so many checks. He was not told for what he wanted them.

We have gone very fully into the evidence leading up to the fifth and sixth exceptions, in order that it may be seen whether the answers to the questions objected to, when considered in connection with the evidence admitted without objections, injuriously affected the plaintiff, even though it should be held that the defendant pursued this line of questioning beyond what he should have done. In view of the evidence preceding the question involved in the fifth exception, and the doubtful character of the answer of the wit-

ness, voluntarily given, to which the question was directed to ascertain its meaning, and the statement of the Court that the witness was not required to answer the question if it involved his private affairs, not connected with the matter in controversy, the Court, in our opinion, committed no reversible error in permitting the question to be asked.

As we have already said, no objection was made to the answer, involved in the fifth exception, and the witness was permitted thereafter to state facts that, without explanation, were more harmful to the character of the witness, as affecting his credibility, and more injurious to the plaintiff's case, by reason thereof, than the answer to the question objected to in the sixth exception; and consequently, we can find no reversible error in the Court's ruling upon the sixth exception.

The ruling of the Court upon the seventh exception was entirely proper upon cross-examination.

The eighth exception was to the admissibility of a letter from Hecht to the witness, Yates. It was offered and admitted to refresh the memory of Yates as to a meeting with Hecht at the Caswell Hotel on January 14, 1917. We find nothing in its contents to injure the plaintiff.

The ninth exception is to the admissibility of another letter of March 21, 1914, from Yates, manager of the Shawmut Mining Company, to Hecht, in which he denied having employed Hecht as his attorney. He had prevoiusly stated in his testimony that Hecht was not his attorney, and consequently this admission of the letter could not have injured the plaintiff.

We discover no error in the Court's rulings in the tenth, eleventh, twelfth and thirteenth exceptions.

The fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first and twenty-second exceptions are to conversations had by the witness, Hecht, with Yates, which are claimed by the plaintiff to be privileged communications, because of the alleged relation of at-

torney and client existing between Hecht and Yates. Yates was the agent of the Shawmut Mining Company, and it was with him that Llewellyn did all of his dealings in connection with the purchase of the goods mentioned in the account, filed with the declaration, upon which this suit is instituted. Yates, produced on the part of the plaintiff, had already testified as to the existence of a co-partnership between Padgett and Llewellyn, and had been asked concerning conversations with Hecht, which, as claimed by the defendant, were inconsistent with any knowledge, on his part, of any such co-partnership. There were no objections interposed thereto, or any claim made at the time, that said conversations were privileged communications, because of the relation of attorney and client, existing between them; but Yates, on the contrary, denied that Hecht was, at the time of such conversations, his attorney. He said of Hecht that he never regarded him as of any consequence whatever, beyond that of an office boy for Mr. Padgett, that he did not place any great stock in Mr. Hecht, and concluded by saying that Hecht "never was a recognized attorney of mine."

The privilege resulting from communications between attorney and client is designed to secure the client's confidence in the secrecy of his communication, but it assumes, of course, that the communications are made with the intention of confidentiality. The moment confidence ceases, privilege ceases. *Wigmore on Evidence,* sec. 2311. If Yates did not recognize Hecht as his attorney the communications were not made to him as his attorney, and consequently such circumstances were without that confidentiality that is requisite, under the rule, to make it a privileged communication. It may also be said that while the privilege is for the protection of the client, he may waive the privilege, and this may be done by implication, for instance, he can not be allowed, after disclosing as much as he pleases, to withhold the remainder. In view of the testimony of Yates, the evidence admitted under these exceptions was properly admitted.

We find no error in the Court's ruling in the exclusion of evidence offered in the twenty-third, twenty-fourth and twenty-fifth exceptions.

The Court's rulings in admitting the evidence in the twenty-sixth, twenty-seventh, twenty-eighth and twenty-ninth, and its excluding the evidence offered under the thirtieth and thirty-first exceptions were proper.

The thirty-second and thirty-third exceptions were to the exclusion of evidence offered in rebuttal, which evidence was properly excluded, and the same may be said of the thirty-fourth and thirty-fifth exceptions.

The thirty-sixth exception goes to the ruling of the Court upon the defendant's first and second prayers that were granted, and the plaintiff's second prayer that was refused. The defendant's first prayer relates to the burden of proof, and we are unable to find any error committed by the Court in granting that instruction; nor do we find any defect in the defendant's second prayer to which the appellant, in its brief, makes no allusion.

Both the granted and rejected prayers of the plaintiff appear to have been drawn upon the theory that there was a plea of limitations in the case, but there was none. It is, however, only to the second or rejected prayer that our attention need be given; and this prayer was properly rejected.

There is a motion in this case to dismiss the appeal, involving not only the construction of Chapter 625 of the Acts of 1916, but the validity of that Act. These questions will be disposed of in an opinion hereafter to be delivered in a case now pending before us, and as it is our opinion that the judgment below in this case should be affirmed regardless of our views of the questions raised by the motion to dismiss, it is not necessary to discuss the motion.

Having found no error in the rulings of the Court below the judgment of that Court will be affirmed.

*Judgment affirmed, with costs to the appellees.*