# RONALD L. NOBLE *v.* DIRECTOR, PATUXENT INSTITUTION

[No. 1017, September Term, 1975.]

*Decided June 30, 1976.*

The cause was argued before MORTON, ■GILBERT and LOWE, JJ.

*Philip L. Marcus, Assigned Public Defender,* for appellant.

*Donald R. Stutman, Assistant Attorney General,* with

whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Stephen Wilder, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

A jury of the Criminal Court of Baltimore determined that appellant was a defective delinquent thereby consigning him indeterminately to Patuxent Institution. In this appeal, appellant raises eight issues relating to errors which allegedly occurred during the trial. We find him correct in only one.

A psychologist from Patuxent Institute was qualified as an expert and expressed his opinion that appellant was a defective delinquent within the meaning of Md. Code, Art. 31B, § 5. He explained that his opinion was based upon three things:

" . . . the raw data plus the information in the chart plus the interview by the diagnostic staff."

The "raw data" to which he referred were a series of psychological tests upon which he placed great reliance in formulating his opinion:

"Q As a matter of fact, if for some reason you would not be able to make the tests, you would not actually be able to make a determination, could you?

A I may in my own mind but I certainly wouldn't come into Court without them.

Q You would not testify without having given the tests?

A I could not."

The four tests were described in general by the psychologist:

"There are four tests known as the standard battery. There is a Wechsler Adult Intelligence Scale, which is self-explanatory. It produces an

intelligence test, an I.Q., both verbal and performance sections. It is also interpretive of feeling status. The second is a Rorschach, which is a series of ten ink blots. It is a projective test. The third is the Bender-Gestalt, a series of nine cards of geometric patterns that the patient is asked to copy as he sees them. This test will tell us something about any neurological problems that he has, any brain damage. It also elicits many other emotional factors such as frustration tolerance, something about how he relates to people — men and women, and this kind of information. The fourth is a series of drawings called the house, tree, person.

Q Could you speak up, Mr. Esserwein?

A The fourth is a series of drawings called house, tree, person, in which he is required to draw each of these figures. It too is a projective test which simply means that the patient tends to place in these figures elements of his personality which he is not aware that he is doing."

We pause to note that imperative to a finding of defective delinquency is that the defendant have

" . . . either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society . . . ." Art. 31B, § 5.

Apropos of that requirement, the psychologist testified that the tests of appellant revealed that:

"He has a verbal I.Q. of 68. The mental defective range is from 60 to 69. His verbal I.Q. is 68, performance I.Q. is 77, full scale is 70. This is one point off of the mental defective range. It is called borderline defective range. In terms of his emotional makeup, perhaps it is best to reach the summary.

Q Please.

A 'The patient's value system and emotions

remain essentially that of a child. Feeling inadequate as a man and dominated by strong dependency needs, he feels himself at a disadvantage in coping with the environment. Frustration tolerance is low when he doesn't get his way and at these times he can erupt into explosive behavior.' "

The psychologist was asked:

"Q What attitude, if any, did your testing, did your examination of Mr. Noble reveal as his, with respect to his attitude towards women?",

and he replied:

"The test results revealed that he, that is his basic problem but it's more or less of a double bind upon him and that he places upon Linda Redd and would tend to place upon any woman that he was living with. On the one hand, one horn of the dilemma is that he wants the woman to mother him but it must be undercover. He doesn't want this out in the open. She is not supposed to mention it. And the other horn of the dilemma is she must look upon him as a very strong he man who can make decisions and she can lean on him so that outwardly she must show that she is leaning upon him while covertly it is the other way around. Now, when either one of these demands are threatened or frustrated, this is what used to be a temper tantrum then comes into play. It takes over his whole personality and he goes into a rage and loses control of himself. This was the major element on the test.

Q Let's get to the last part of the definition, which is that it clearly demonstrates an actual danger to society so as to require such confinement and treatment. Did you find this in Mr. Noble?

A Yes.

Q What is the basis for this finding?

"A Both the results of the test and increasing severity of the assault pointing to a growth process of this pathology. It is increasing in intensity."

He described the conclusions he drew from the test results:

"Q When you were describing the house, tree, person test . . .

A Yes.

Q . . . you said something to the effect of a person's character traits coming out that are in him that he is not aware of?

A Personality traits, yes, that he places in these, projects onto the figures things about himself that he is not aware of, that he is not aware that he is putting there.";

however, his explanation of how he arrived at his conclusions was less than satisfactory.

"Q What is your evidence that, in general or in specific — first take the general — that a person does really do that, that is, he takes from inside himself without knowing it and puts it on paper?

A Just all of the past research on these four tests, known as the standard battery, the fact that they are generally accepted by all the behavioral sciences throughout the country.

Q Generally accepted?

A Yes.

Q Have you done any research?

A No."

The cross-examination by appellant's counsel sporadically elicited some explanation of each of the tests. For example,

"Q Now, you did administer a Rorschach Test, is that correct?

A That's correct.

Q Is that sometimes known as an ink blot test?

A Yes.

Q And that means that you show some — they are not really ink blots, are they?

A No, they are manufactured cards.

Q But they look like ink blots?

A Yes.

Q And you show these to the patient or subject?

A That's correct.

Q And he is supposed to explain what he sees in them?

A That's correct.

Q Now, those responses on this test does not in any way connect with the patient's past history, do they? Isn't that a test that is due on the spot, so to speak?

A Yes.

Q It has nothing to do with the past history. And could you describe very briefly how you do a Bender-Gestalt?

A It is a series of nine geometric patterns which I place before the patient one at a time and simply instruct him to copy them just the way he sees them.

Q And, again, they are related to what he is, how he thinks at the time as opposed to history, isn't that correct?

A What is being tested is the person, his thinking, his feelings. It has nothing to do with any, you know, concrete historical events.

Q And that is true of the projective drawings, isn't it?

A. Yes.

Q Drawing test. Now, wouldn't you say that you are very dependent in making your analysis, or within this particular case, on the results of those tests?

A That's correct."

However, when appellant sought to have the source material for the psychologist's opinion (which source material had been subpoenaed) placed in evidence before the jury, he was denied that right.

"Q You have just been handed a group of documents. Can you identify what those documents are?

A This is the file on Ronald Noble that contain the test material and the Social Service Report and the Diagnostic Staff Report that is kept in the Psychology Department as a regular part of the business.

MR. MARCUS: Your Honor, I offer this collection of papers collectively as Defendant's Exhibit, I think it is Number One.

MR. WILDER: Objection, Your Honor.

THE COURT: For what purpose?

MR. MARCUS: Your Honor, these are, as has been indicated to you, the actual materials and I think it is only fair for the jury to be able to examine the materials.

MR. WILDER: I object to this too.

THE COURT: Is it a duplication of reports in there?

MR. MARCUS: Your Honor, I believe there is some duplication but it is not total duplication.

THE COURT: What does it consist of, the raw data of the tests actually made by Mr. Esserwein?

MR. MARCUS: I would hope so, Your Honor.

THE COURT: Is that what it contains, Mr. Esserwein?

THE WITNESS: Yes, Your Honor. I feel strongly that there is an ethical question involved.

THE COURT: Is it the raw data?

THE WITNESS: Yes, Your Honor.

THE COURT: Of your tests?

THE WITNESS: Yes, Your Honor.

THE COURT: Of what you made your opinion on?

THE WITNESS: Yes, sir.

THE COURT: Objection sustained as to the introduction of that in evidence."

Presumably to preserve the issue for appeal and to provide a basis for cross-examination of the expert, appellant's counsel asked:

"All right, Your Honor. May they be marked simply for identification?",

but even that was denied.

"THE COURT: No, they may not."

Although restricted by the ruling, appellant bore on, attempting to elicit the foundation for the psychologist's damning conclusions:

"Q Is it your testimony that you cannot look at any individual test protocol and get any meaningful information from that?

A I didn't say that. I didn't say you could not look at a test protocol and get meaningful information.

Q What is a test protocol?

A I didn't finish the question.

Q Go ahead.

A You were talking about looking at a given response. None of them have any meaning in and of themselves. They develop a profile. Every response is taken into account. This must be analyzed in several different ways. Without the use of reference books, I don't know how to pick it out for you.

Q Do you have those reference books in Court?

A No, I do not.

Q Well, could you give us an example, for example, looking at several of those tests or the whole batch of tests and tell us this particular response when asked to, this response and that response?

A No, I cannot.

Q You cannot. Why not?

A I wouldn't know where to start explaining my thinking or my analysis. You don't have the background of technical knowledge used. I don't have the reference works to work with. It's a three-to-four-hour job. I just wouldn't know where to start. I'd have to start training you in Rorschach signs. This would take a couple of years.

. . .

"THE COURT: Is it possible, Mr. Esserwein, for a lay person, a lawyer or a judge, not trained in the field of psychology to interpret that raw data in any way whatsoever?

"THE WITNESS: It took me eight years to learn it with the help of reference works."

The lay understanding of the raw data was dismissed as impossible:

"THE COURT: Well, again, is it possible that a person . . .

THE WITNESS: I don't believe so.

THE COURT: . . . not trained in the field of psychology would be able to look at the raw data and draw a conclusion as to whether or not Mr. Noble is a defective delinquent based on your other data in those reports?

THE WITNESS: It would be impossible."

We think the court erred when, having ruled that the data upon which the opinion was founded could not be admitted, it further declined to permit the disputed data to be marked

for identification, thus effectively precluding us from reviewing the material upon appeal. Without the disputed material before us, it is impossible to decide whether the discretion exercised by the trial judge in excluding it was abused.

In *Councill v. Sun Ins. Office,* 146 Md. 137, 147, appellant complained that a letter was erroneously excluded from evidence. The Court, pointing out the absence of the letter from the record on appeal, declined to assume error, saying:

> " . . . but as the letter does not appear in the record it is impossible for us to say whether the appellant was injured by that ruling, or to assume that it was erroneous."

The holding in that case presupposes a burden upon appellant to produce the excluded evidence for our review. Here, the appellant did all that was required of him by moving to mark the disputed documents for identification. It is the refusal of the court below to comply with that motion that prevents us from reviewing its determination not to admit the raw data into evidence. Though it is impossible for us to say that appellant was injured by that decision, it is equally impossible to hold that he was not. The trial court should have marked the material for identification when requested to do so by counsel. *Duncan v. McTiernan,* 151 Conn. 469. *Accord Bonnette v. Molloy,* 209 N. Y. 167.

In *Wimpling v. State,* 171 Md. 362, 376, the Court of Appeals recognized that expert opinion testimony should only be resorted to when "it clearly appears that it is essential to a full and fair presentation of the case and will aid the trier of fact in dealing with it," because such testimony is of the " 'very lowest order and the most unsatisfactory character.' " Impliedly then, expert testimony should be scrutinized carefully and subjected to a rigid test of the foundation upon which the opinion was formed. The *Wimpling* Court quoted *Jones on Evidence,* saying:

> " 'It has been said of expert testimony: 'It is not

desirable in any case where the jury can get along without it, and is only admitted from necessity, and then only when it is likely to be of some value.' 'The evidence of experts is of the very lowest order, and the most unsatisfactory character.' All testimony founded upon opinion merely is weak and uncertain, and should in every case be weighed with great caution. 'The unsatisfactory nature of such evidence is well known." *Wimpling v. State*, 171 Md. at 376.

Since the very nature of a proceeding to determine defective delinquency compels total reliance upon opinion testimony by experts in the fields of psychology and psychiatry, every avenue should be left open to test the opinions expressed by such witnesses which, if persuasive, will resign the defendant to indefinite imprisonment. The most effective way of undermining the impact of an expert opinion is by exposing the weakness of its foundation through an attack on the facts upon which the opinion is based. By doing so, the accused may be able to convince the jury that the "opinion" was erected upon a foundation of sand and should not be given credence.

The Court of Appeals has placed great importance upon permitting the eliciting of all of the facts upon which an expert opinion is based. After stating that one of the most firmly established principles enunciated by that Court is that an expert witness must predicate his opinion on premises of fact, Judge Prescott, in *State, Use of Stickley v. Critzer*, 230 Md. 286, 290, said that "no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient basis to support a rational conclusion is shown."

In *Dickinson-Tidewater v. Supervisor*, 273 Md. 245, 253, the Court, through Judge Levine, said:

"Unquestionably, the facts upon which the opinion of an expert witness is predicated must be stated, *Fink v. Steele*, 166 Md. 354, 363, 171 A. 49 (1934); this is so because the opinion of an expert

must rest upon facts legally sufficient to form a basis for his conclusion, *Stickell v. City of Baltimore*, 252 Md. 464, 474, 250 A. 2d 541 (1969). If the facts relied upon for the expert opinion are not revealed, it becomes impossible to ascertain whether the conclusion drawn from them possesses sufficient probative force; or is not mere conjecture or speculation, *State, Use of Stickley v. Critzer*, 230 Md. 286, 290, 186 A. 2d 586 (1962); *Fink v. Steele, supra.*"

And in *Fink v. Steele*, 166 Md. 354, 363, which appears to have been the foundation for both *Critzer* and *Dickinson-Tidewater*, the Court quoted itself in *Berry Will Case*, 93 Md. 560 at 580 and several others, saying:

" 'There must be a basis shown for the formation of a rational conclusion which is not a mere conjecture, but is knowledge. Hence, if that basis is trivial or insufficient, or does not furnish, in the judgment of the court, an adequate ground to support such a conclusion as amounts to knowledge, the witness should not be permitted to express any conclusion at all. Facts must be stated so that it may be seen whether the conclusion deduced from them by the witness has any relation to, or can be fairly said to be dependent on, them.' "

See also *State Health Dep't v. Walker*, 238 Md. 512, 520; *Millison v. Secretary of Health and Mental Hygiene*, 32 Md. App. 165 (1976).

When an expert opinion is admitted without the factual foundation upon which it was formed, a jury is left with no basis upon which to test the reasonableness of what may have been (for all that is known) mere *simplex dictum.* Without some scale upon which to weigh the assertion, lay jurors, called upon to pass judgment in a technical field, may accept as *mirabile dictum,* the expert's judgment in substitution for their own.

The State argues that the introduction of the raw data would not aid the jury in its deliberation because such material would tend to confuse and mislead them and thus its admission is within the discretion of the trial court, citing *Purks v. State*, 226 Md. 43. However, since the evidence is not before us we cannot so conclude. We have no way of knowing whether the exclusion was a proper or an improper exercise of judicial discretion. Indeed from the record it would appear that even the trial judge did not review the evidence but relied solely upon the opinion of the psychologist that neither judge nor jury could comprehend the mysteries of psychological testing. This is not an exercise of judicial discretion but rather a judicial exercise of a psychologist's discretion.

When such evidence is excluded and its review denied us by the court below, we cannot acquiesce in the State's suggestion that even if error, the exclusion was harmless. Recognizing that defective delinquency need not be proved beyond a reasonable doubt, nonetheless, under the guidelines of *Dorsey v. State*, 276 Md. 638, we cannot conclude that, even under a preponderance test, the error was harmless. As noted in *Dorsey*, at 657-658,

> "The abnegation of a particular rule upon which the defense intended to rely may often inflict more damage than initially apparent; a meritorious line of defense may be abandoned as a result; an important witness may not be called; strategies are often forsaken. The future course of the trial inevitably must be changed to accommodate the rulings made. It is the impact of the erroneous ruling upon the defendant's trial and the effect it has upon the decisional process which is of primary concern, not whether the error is labelled as constitutional or nonconstitutional."

*Judgment reversed.*
*Case remanded for new trial.*