MARGARET MELTON PRATT *v.* STATE OF MARYLAND

[No. 857, September Term, 1977.]

*Decided June 7, 1978.*

The cause was argued before THOMPSON, LOWE and COUCH, JJ.

*Robert C. Heeney* and *John M. Quinn,* with whom were *Heeney, McAuliffe, Rowan & Abell* on the brief, for appellant.

*Stephen Rosenbaum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Laurence D. Beck, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

The appellant, Margaret Melton Pratt, was convicted in the Circuit Court for Montgomery County of murder in the second degree and use of a handgun in the commission of a crime of violence. A fifteen year sentence, seven of which were suspended, was imposed on the murder charge along with a concurrent five year sentence for the handgun conviction.

The murder scenario which led to this appeal began on October 22, 1976 when appellant removed a .32 caliber automatic pistol from her husband's business vault.[1] At that time she was emotionally distressed and planned to use the gun to commit suicide. After removing the weapon appellant went home, stopping only at a local grocery store to purchase some food for the evening meal. When she arrived home, her husband, William Pratt, who had left work early because of illness, was watching television. Appellant prepared the evening meal and after dinner she and her husband spent an uneventful evening watching television before retiring for the night.

Appellant could not sleep thinking about her contemplated suicide and the consequences of such an act on her husband because she handled the family finances, and tended to his personal needs which were many because of general ill health. There was also some question as to the financial position of the business which worried her. At approximately 7:00 the next morning, after a sleepless night, appellant entered her husband's bedroom, placed a gun against his head, and shot him. After the initial shot was fired Mr. Pratt began to breathe erratically so appellant fired a second shot to end any possible suffering.

---

1. Most of the details of our recitation of the facts are based on appellant's statement to the police officers. She did not testify at the trial.

After the shooting, appellant packed an overnight bag and traveled to the farm of friends near Front Royal, Virginia. Her dog was buried on the farm and she spent two or three hours praying at its gravesite. As the friends were not at home, she spent the night in a nearby motel before returning to her home the next day. When appellant arrived home, she wandered around in her car visiting the neighborhood in which she and her husband formerly lived. Realizing she would eventually be apprehended, she went to the police and informed them of her crime. After the police verified the commission of the murder, appellant was formally arrested and ultimately transported to Springfield Hospital Center for psychiatric evaluation.

During the trial the defense did not contest the accusation that appellant had killed her husband, but contended she was insane at the time of the crime. In support of her contention appellant presented two psychiatrists, Dr. Gerald Polin and Dr. Leon Yochelson. They testified that at the time of the crime appellant was suffering from a mental illness and lacked substantial capacity to conform her conduct to the requirements of the law.

In order to counter this testimony the State produced three psychiatrists. All expressed the opinion that appellant was suffering from a mental disorder at the time of the offense; two of the three psychiatrists felt she was legally responsible for her act.

On appeal appellant attacks the validity of her convictions, contending the trial judge committed reversible error in:

(1) Admitting the testimony of Dr. Brian Crowley, one of the State's psychiatrists, who originally examined appellant at the request of defense counsel;

(2) Refusing to admit testimony corroborative of the factual basis of the opinions given by the defense psychiatrists, even though the State attacked their basis of knowledge;

(3) Refusing to admit a video tape of an interview between appellant and Dr. Polin;

(4) Admitting a report written by Dr. McClelland stating appellant was criminally responsible for her acts, after he was unable to express an opinion on the question at trial;

(5) Unduly restricting cross-examination of a police officer concerning the amount of money appellant had at the time of her arrest;

(6) Admitting pictures of the body of the deceased; and

(7) Denying her right to argument of counsel regarding a possible recommendation of mercy by the jury.

## I Dr. Brian Crowley's Testimony

One of the three psychiatrists presented by the State, Dr. Crowley, had originally been retained by the defense. Dr. Crowley testified that although appellant was suffering from a mental disorder at the time of the offense, she did not lack substantial capacity to conform her conduct to the requirements of the law. Appellant mounts a multifaceted attack on the admission of this testimony arguing it should have been excluded on the grounds of: (1) the attorney-client privilege, (2) the psychiatrist-patient privilege, or (3) the work product doctrine. We conclude admission of the testimony violated the attorney-client privilege so we will not discuss the other arguments in any detail.[2]

The attorney-client privilege was defined in *Harrison v. State*, 276 Md. 122, 135, 345 A. 2d 830, 838 (1975) as follows:

" '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as

2. We note, however, that the appellant waived any claim she might have had under the psychiatrist-patient privilege by introducing her mental condition as a defense. Bremer v. State, 18 Md. App. 291, 334, 307 A. 2d 503, 529, *cert. denied,* 269 Md. 755 (1973), *cert. denied,* 415 U. S. 930, 94 S. Ct. 1440, 39 L.Ed.2d 488 (1974); Md. Code, Cts. and Jud. Proc. Art. § 9-109 (e) (2) (1977 Supp.).

The State argues that even if the attorney-client privilege has not been waived, the privilege cannot be asserted because the work product doctrine is inapplicable. The work product doctrine, however, is separate from the attorney-client privilege and serves to protect materials from discovery that are not subject to another privilege. *See* C. McCormick, Handbook of the Law of Evidence § 96 at 204-205 (2d. ed. E. Cleary 1972).

such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.' '' Quoting 8 J. Wigmore, *Evidence* § 2292 at 554 (McNaughton rev. 1961).

The theory behind the creation of the privilege is that a lawyer can act effectively only when he is fully advised of the facts and the client's knowledge that a lawyer cannot reveal his secrets promotes full disclosure. *Harrison v. State, supra,* 276 Md. at 133-134, 345 A. 2d at 837; *Trupp v. Wolff,* 24 Md. App. 588, 608-609, 335 A. 2d 171, 183-184, *cert. denied,* 275 Md. 757 (1975). The privilege is not confined in scope to communications made solely between an attorney and his client but includes communications made to agents employed by the attorney, such as a stenographer, secretary, clerk, or any employee necessary for effective operation. 8 J. Wigmore, *Evidence* § 2301 at 583; C. McCormick, *Handbook of the Law of Evidence* § 91 at 188-189 (2d. ed. E. Cleary 1972).

In cases where a question arises concerning a client's criminal responsibility for an act, a psychiatrist is indispensable for his help in the planning and preparation of the defense as well as his testimony at trial. The attorney could hardly explore the basis of adverse testimony intelligently, without such help. *See United States v. Taylor,* 437 F. 2d 371, 377 n.9 (4th Cir. 1971); *United States v. Alvarez,* 519 F. 2d 1036, 1046 (3rd Cir. 1975); *United States ex rel. Edney v. Smith,* 425 F. Supp. 1038, 1047-1048 (E.D.N.Y. 1976), *aff'd mem.* 556 F. 2d 556 (2nd Cir. 1977); *People v. Lines,* 13 Cal. 3d. 500, 531 P. 2d 793, 800 (1975); *United States v. Kovel,* 296 F. 2d 918, 921 (2nd. Cir. 1961) (Friendly J.).[3]

As the assistance of a psychiatrist is essential where the criminal responsibility of a client is in question, we hold that

3. Some courts have analogized the function of a psychiatrist to that of an interpreter. *See* City & County of San Francisco v. Superior Court, 37 Cal. 2d 227, 231 P. 2d 26 (1951); Lindsay v. Lipson, 367 Mich. 1, 116 N.W.2d 60, 63 (1962).

communications made to a psychiatrist for the purpose of seeking legal advice are within the scope of the attorney-client privilege. This position is supported by the overwhelming majority of courts and commentators that have considered the question.[4]

The State, not seriously disputing that communications made to a psychiatrist in conjunction with the preparation of an insanity defense should be afforded the protection of the attorney-client privilege, argues appellant waived any claim of privilege by placing her sanity in issue. Although there can be no question that a client may expressly or impliedly waive the attorney-client privilege, *Harrison v. State, supra,* 276 Md. at 136-138, 345 A. 2d at 839; *Shawmut Mining Co. v. Padgett,* 132 Md. 397, 404, 104 A. 40, 43 (1918), we do not think a waiver occurs when an accused places his sanity in issue. There is no precise formula for determining whether the privilege has been waived in a particular case. In deciding this question various factors such as the client's intent to waive, fairness, and consistency of conduct must be considered in view of the purpose of the privilege. *See Harrison v. State, supra,* 276 Md. at 138, 345 A. 2d at 840; 16 Minn. L. Rev. 818, 823 (1932).

In arguing that fairness dictates that the privilege should be deemed to have been waived the State relies on the rationale of *People v. Edney,* 39 N.Y.2d 620, 350 N.E.2d 400 (1976). That court concluded there was no need to protect communications made to a psychiatrist once the issue of the client's sanity was placed in issue. The court's reasoning was predicated on several factors. First, under New York law once an accused pleads insanity he is required to disclose the underlying basis of his affliction to prosecution psy-

---

4. In addition to the cases cited above, *see,* Jones v. Superior Court, 58 Cal. 2d 56, 372 P. 2d 919, 921-922 (1962); People v. Hilliker, 29 Mich. App. 543, 185 N.W.2d 831, 833 (1971); State v. Kociolek, 23 N. J. 400, 129 A. 2d 417, 423-425 (1957); F. Wharton, Criminal Evidence § 559 at 79 (13th ed. C. Torcia 1973); B. Jones, Evidence § 21:15 at 786 (6th ed. S. Gard 1972); C. McCormick, Handbook of the Law of Evidence § 91 at 188 n.82 (2d. ed. E. Cleary 1972). *But see,* Friedenthal, Discovery and Use of an Adverse Party's Expert Information, 14 Stan. L. Rev. 455, 463-465 (1962). The privilege, however, does not apply where the psychiatrist is retained to treat the client rather than to assist the attorney in rendering legal advice. People v. Lines, *supra,* 531 P. 2d at 800-801 n. 12; City & County of San Francisco v. Superior Court, *supra,* 231 P. 2d at 31-32.

chiatrists.[5] Thus, the court reasoned that if an insanity plea is entered the facts in question will be available to the prosecution in any event and, as a result, the waiver rule would not deter a client from communicating with a psychiatrist hired to assist his attorney. Second, the court noted that under the work product doctrine an attorney could consult a psychiatrist without fear of future disclosure as long as the attorney, and not the client, conveyed the necessary facts to the expert.[6]

Despite *Edney* we think the better approach is that the client does not waive the attorney-client privilege by placing sanity in issue. *See* particularly, *United States v. Alvarez, supra* at 1046-1047; *People v. Lines, supra,* 531 P. 2d at 799-802; *State v. Kociolek, supra,* 129 A. 2d at 425-426. *Cf., Pouncy v. State,* 353 So. 2d 640 (Fla. App. 1977) (accused does not waive privilege by placing sanity in issue unless trier of fact is so deprived of a valuable witness as to undermine public interest in the administration of justice). The waiver rule urged by the State would seriously undermine the purpose of the privilege by impairing effective assistance of counsel in several respects. Even though the work product doctrine serves to protect communications between the attorney and the psychiatrist, as a practical matter the advice of an expert based exclusively on an attorney's communications will be worth much less than advice given after an examination of the client. In addition, as expert testimony is essential to a defense of insanity, the attorney will eventually have to submit his client for examination before formulating a defense strategy. In so doing he will be running the risk that the psychiatrist will later be called to testify by the State. As a result the client might be less open and candid in communicating with the psychiatrist. This in turn impairs the value of the psychiatrist's advice and lessens the effectiveness of counsel. The problem posed was

5. A similar provision is contained in Md. Code, Art. 59, § 25 (b) (1972 Repl. Vol.). Such a requirement has been upheld against attacks that it amounts to a *per se* violation of the accused's right against self-incrimination. Bremer v. State, *supra,* n. 2, 18 Md. App. at 316-318, 307 A. 2d at 520-521.

6. *Cf.,* Hall v. State, 36 Md. App. 362, 373 A. 2d 1250 (1977) (opinion of psychiatrist prepared in anticipation of litigation not discoverable under work product doctrine absent showing of exceptional circumstances).

convincingly stated by the Court in *United States v. Alvarez,*
*supra* at 1046-1047.

> "The issue here is whether a defense counsel in a
> case involving a potential defense of insanity must
> run the risk that a psychiatric expert whom he hires
> to advise him with respect to the defendant's mental
> condition may be forced to be an involuntary
> government witness. The effect of such a rule would,
> we think, have the inevitable effect of depriving
> defendants of the effective assistance of counsel in
> such cases. A psychiatrist will of necessity make
> inquiry about the facts surrounding the alleged
> crime, just as the attorney will. Disclosures made to
> the attorney cannot be used to furnish proof in the
> government's case. Disclosures made to the
> attorney's expert should be equally unavailable, at
> least until he is placed on the witness stand. The
> attorney must be free to make an informed
> judgment with respect to the best course for the
> defense without the inhibition of creating a potential
> government witness."

Another reason the psychiatrist's testimony should be
rejected is because his employment by the other side tends
to add undue weight to his testimony. In the instant case, the
State emphasized this in its closing argument to the jury. This
problem, however, could be eliminated by prohibiting
evidence concerning the expert's original employer from
being presented to the jury. *See, United States ex rel. Edney*
*v. Smith, supra* at 1053. *Cf., Mayor of Baltimore v. Zell,* 279
Md. 23, 28, 367 A. 2d 14, 17 (1977) (admission of evidence
indicating an expert was originally retained by the other
party is within the sound discretion of the trial court).

It has been suggested that application of the attorney-client
privilege to psychiatrists allows the defense to suppress
unfavorable experts while shopping around for an expert that
supports its position. *See United States ex rel. Edney v.*
*Smith, supra* at 1052.[7] When one considers this possibility it

---

7. The court in Smith also suggested that an examination by a defense

seems that fairness would dictate that the State be granted access to all psychiatrists employed by the defense, even though it does not intend to use them at trial. A close examination of this argument, however, reveals that the State would not significantly benefit from access to these individuals. The State already has access to the underlying factual basis of the accused's mental affliction for use by its psychiatrists. *See Md. Code,* Art. 59, § 25 (b) (1972 Repl. Vol.). Hence, the actual information disclosed would not be of any real value to the State. As long as there is a sufficient number of experts available, there is no real danger, as a practical matter, of the defense using the cloak of the privilege to remove "unfriendly" experts.[8]

## II The Refusal to Admit Corroborative Testimony

In formulating their opinions, both defense psychiatrists considered the history given by appellant dealing with her concern over Mr. Pratt's health, his increasing vanity, and the deteriorating finances of the family to be significant. During cross-examination the State asked several questions concerning what attempts the psychiatrists had made to verify the information given by appellant. The natural implication of these questions was that the history given by appellant might have been falsified and the diagnoses of the psychiatrists would, therefore, be inaccurate. Defense counsel attempted to rehabilitate the testimony of Dr. Polin and Dr. Yochelson by offering testimony to corroborate the factual basis of their opinion. Several witnesses were offered in this regard.[9] Through these witnesses the defense

psychiatrist shortly after the crime might be more valuable than a later examination by a State psychiatrist. There is, however, no evidence to suggest that the examinations by defense psychiatrists had more validity than the examination at the Springfield Hospital Center.

8. In light of our disposition of this issue, we need not discuss the subsidiary issue of whether the trial court erred in restricting cross-examination of Dr. Crowley concerning his contacts with the State's Attorney.

9. The witnesses offered were a close friend of appellant, her son, and the family doctor. The son, a financial analyst, was allowed to testify, without objection, that the business was in a poor financial position, but was prohibited from further comment on the business absent some official record from the corporation indicating that he was officially in charge of the company's books.

The specific challenge made by appellant in regard to the son's testimony

attempted to verify that Mr. Pratt was in poor health; he had become increasingly demanding of appellant; the family business was experiencing financial difficulties; and appellant was deeply concerned over these matters. The trial judge ruled that since the psychiatrists had not relied on these witnesses to prepare appellant's history they could not be used as corroborative witnesses. The trial judge did, however, admit evidence bearing on appellant's state of mind within a month of the murder, apparently ruling that it was independently relevant.

Once the testimony of a witness has been impeached, a party is generally allowed to introduce corroborative evidence. *See Mayor of Baltimore v. Zell, supra,* 279 Md. at 27, 367 A. 2d at 16; *Gill v. Staylor,* 93 Md. 453, 49 A. 650 (1901). This same rule, with certain exceptions which are not relevant here, applies to the testimony of expert witnesses. 2 E. Conrad, *Modern Trial Evidence* § 695 at 590 (1956). Such corroborative evidence is not restricted in form; any evidence corroborative of the testimony may be used. In the case *sub judice,* the action of the trial judge, in effect, restricted the availability of such evidence to the testimony of appellant. While the admissibility of corroborative evidence is largely within the trial court's discretion, 2 F. Wharton, *Criminal Evidence* § 494 at 475 (13th ed. C. Torcia 1972), we think the trial court here was unduly restrictive in ruling as he did under the facts of this case.

### III Admissibility of the Video Tape

The third error claimed by appellant is that the trial judge should not have prohibited defense counsel from using a video tape of an interview conducted by Dr. Polin. The tape in question, which was prepared during Dr. Polin's initial interview with appellant, was used as a diagnostic aid and was made without appellant's knowledge. According to Dr. Polin

---

concerned the admission of a series of uncashed checks payable to appellant which defense counsel offered through this witness to show the business was in poor financial condition. However, the probative value of this evidence in light of previous testimony concerning the business was so slight that we are unable to say the trial judge abused his discretion in refusing to admit it.

he used the video tape to observe the demeanor of appellant so that he could verify his impressions concerning her veracity. In addition the video tape allowed him to confirm certain of his own observations. The trial judge did not view the tape in ruling on its use but merely stated he felt the tape would not be necessary or helpful. The tape was not included as part of the record on appeal.

In *Tobias v. State,* 37 Md. App. 605, 615, 378 A. 2d 698, 704 (1977), *cert. denied,* December 21, 1977, we held that video tape recordings are admissible on the same basis as motion picture films and subject to the same general rules applicable to photographic evidence. *See Colbert v. State,* 37 Md. App. 383, 386-387, 377 A. 2d 585, 587-588 (1977). Thus, the evidence was not inadmissible merely because it was a video tape. Although the record is not clear on exactly what use appellant planned to make of the tape, presumably it was going to be used to help explain the basis of Dr. Polin's opinion. In this regard we note that an expert is not only permitted but may be required to demonstrate the basis for his opinion. *Dickinson-Tidewater v. Supervisor of Assessments,* 273 Md. 245, 253, 329 A. 2d 18, 23 (1974); *Noble v. Director,* 32 Md. App. 192, 202-204, 359 A. 2d 253, 259 (1976).

While the absence of the tape from the record precludes us from specifically passing on its admissibility, we do not see how the trial judge could have properly exercised his discretion in deciding the evidence would not be necessary or helpful without viewing the tape.[10] *Cf. Tripp v. State,* 36 Md. App. 459, 482-483, 374 A. 2d 384, 397-398 (1977), *cert. denied,* September 7, 1977 (exclusion of video tape upheld where trial judge, after viewing the tape, concluded it might confuse the jury). To the extent that the tape may have been cumulative, it was, of course, within the discretion of the trial judge to admit or reject it. *See Drug Fair v. Smith,* 263 Md. 341, 355, 283 A. 2d 392, 400 (1971); *O'Connor v. Plotkins, Inc.,* 32 Md.

10. We do not mean to say that the trial judge must review all such evidence before ruling on its admissibility. However, where a proper foundation has been laid and the evidence would otherwise be relevant, a viewing of the tape would be necessary to a proper exercise of discretion unless the evidence is being rejected on the grounds that it is cumulative or it is apparent that the tape is objectionable for some other reason.

App. 329, 334, 362 A. 2d 95, 98 (1976). If this was the basis of the tape's exclusion it would have been helpful if the trial judge had clearly stated this in his ruling.

## IV Applicability of the Business Record Exception to the Report Written by Dr. McClelland

After the second psychiatrist to testify for the State, Dr. Ellis McClelland, was unable to express an opinion on appellant's sanity, the prosecutor offered two letters, which were part of the forensic staffing report prepared at Springfield Hospital Center, pursuant to a court ordered examination under *Md. Code,* Art. 59, § 25 (b) (1972 Repl. Vol.). In those letters Dr. McClelland expressed the opinion that appellant was criminally responsible for her actions at the time of the murder. Counsel for appellant objected on the grounds the State was attempting to impeach its own witness but the court ruled the letters were admissible as substantive evidence under the business record exception to the hearsay rule.

On appeal appellant renews the argument that the admission of the letters allowed the State to impeach its own witness. Although a party cannot use a prior inconsistent statement to impeach his own witness, *Fleming v. Prince George's County,* 277 Md. 655, 677, 358 A. 2d 892, 904 (1976); *Patterson v. State,* 275 Md. 563, 571, 342 A. 2d 660, 666 (1975), a different situation exists where a prior inconsistent statement falls within a recognized exception to the hearsay rule. In these situations, the statement is admissible as substantive evidence even though it has the collateral effect of impeaching a witness's testimony. *See Smith v. Branscome,* 251 Md. 582, 588-589, 248 A. 2d 455, 460 (1968); *Capital Raceway Promotions v. Smith,* 22 Md. App. 224, 237 n. 4, 322 A. 2d 238, 245 n. 4 (1974).

In the instant case it is clear the letters were hearsay; hence, their admissibility turns on whether they fall within an exception to the hearsay rule. The only possible exceptions pertinent are the business record and public record exceptions contained in *Md. Code,* Cts. and Jud. Proc. Art. § 10-101 and § 10-204 (1974). As the letters were admitted under the

business record exception and this is the only ground for admissibility urged by the State, we will discuss this exception in some detail.[11]

In order to be admissible as a business record the letters must have been made in the regular course of a business as a record "of an act, transaction, occurrence, or event..." and it must have been the practice of the business to make such a record. *See, e.g., Pine Street Trading Corp. v. Farrell Lines, Inc.,* 278 Md. 363, 374, 364 A. 2d 1103, 1110 (1976); *Harrod v. State, supra* at 241 n. 11. Ordinarily, hospital records satisfy these criteria and the information they contain is admissible as long as it is pathologically germane. *Dietz v. Moore,* 277 Md. 1, 6, 351 A. 2d 428, 432 (1976); *Yellow Cab Company v. Hicks,* 224 Md. 563, 569-570, 168 A. 2d 501, 504 (1961); *Honick v. Walden,* 10 Md. App. 714, 719-720, 272 A. 2d 406, 410 (1971). *See* Powell, *Admissibility of Hospital Records Into Evidence,* 21 Md. L. Rev. 22 (1961).

One special problem presented by hospital records is whether diagnostic opinions contained in such records are admissible. If the diagnostic opinion is introduced through the hospital records the expert who rendered the opinion is not on the stand for cross-examination; consequently, some courts have refused to admit such statements altogether or have limited their admission to those opinions based on objective data and not readily susceptible to conflicting interpretations. *See Grewe v. Mount Clemens General Hospital,* 47 Mich. App. 111, 209 N.W.2d 309, 311 (1973); *Reed v. Aetna Casualty & Surety Co.,* 535 S.W.2d 377, 379 (Tex. Civ. App. 1976); *Neely v. Johnson,* 215 Va. 565, 211 S.E.2d 100, 106 (1975). This Court, however, has previously held that such opinions are admissible as long as it appears from the hospital record that they were expressed by a qualified person. *Marlow v. Cerino,* 19 Md. App. 619, 636-637, 313 A. 2d 505, *cert. denied,* 271 Md. 739 (1974). *Accord, Rivers v. Union Carbide Corp.,* 426 F. 2d 633, 637-638 (3rd. Cir. 1970); *Thomas v. Hogan,* 308 F. 2d 355, 360-361 (4th Cir. 1962); *Weis v. Weis,*

---

11. The letters would, however, have been admissible as part of an official record. This exception is codified in Md. Code, Cts. and Jud. Proc. Article § 10-204 (1974) and is designed to cover all governmental agencies. Harrod v. State, 39 Md. App. 230, 242, n. 13, 384 A. 2d 753, 761, n. 13 (1978).

147 Ohio St. 416, 425, 72 N.E.2d 245, 250 (1947); *Myers v. Genis,* 235 Pa. Super. 531, 344 A. 2d 691, 694-695 (1975); *People v. Kohlmeyer,* 284 N. Y. 366, 31 N.E.2d 490 (1940).[12]

A more serious obstacle is that the letters were not written during the course of treatment but were prepared for use in determining appellant's sanity. Hospital records are considered trustworthy partially because they are routinely used to make decisions affecting the life and health of the patient. *See,* C. McCormick, *Handbook of the Law of Evidence* § 313 at 730 (2d. ed. E. Cleary 1972). A number of authorities feel that if the report is prepared for a purpose other than treatment this indicia of reliability disappears, especially if the report is prepared in anticipation of litigation. Consequently, these authorities have held the trial court possesses discretionary power to exclude reports which appear to be unreliable even though they satisfy the letter of the business record exception.[13]

We need not decide, however, precisely what rules govern the admissibility of medical reports prepared for purposes other than treatment because the major objection to the admission of such records stems from the unavailability of the declarant for cross-examination. In the instant case Dr. McClelland was on the stand and available for cross-examination, thus we are unable to say the trial judge abused his discretion in admitting the records.

## V Limitation on Cross-Examination of State's Witness

There is no need for us to discuss this question as the record

---

12. Prior to the adoption of the Federal Rules of Evidence for United States Courts and Magistrates (Effective July 1, 1975) a number of federal courts also refused to admit diagnostic statements. *See e.g.,* New York Life Ins. Co. v. Taylor, 147 F. 2d 297 (D.C. Cir. 1945). Under the federal rules, however, reports of "acts, events, conditions, opinions or diagnoses . . . ." may be admitted. Rule 803 (6).

13. *See* Raycraft v. Duluth, Missabe and Iron Range Railway Co., 472 F. 2d 27, 30-31 (8th Cir. 1973); Picker X-Ray Corp. v. Frerker, 405 F. 2d 916, 923-924 (8th Cir. 1969); Korte v. New York, N.H. and H.R. Co., 191 F. 2d 86, 90 (2d. Cir. 1951), *cert. denied,* 342 U. S. 868, 72 S. Ct. 108, 96 L. Ed. 652; Yates v. Bair Transport, Inc., 249 F. Supp. 681, 690 (S.D. N.Y. 1965). *See also,* Palmer v. Hoffman, 318 U. S. 109, 63 S. Ct. 477, 87 L. Ed. 645 (1943). *But c.f.,* Otney v. United States, 340 F. 2d 696, 700 (10th Cir. 1965) (written psychiatric report made for purpose of determining whether criminal defendant was sane at the time of the offense held not to be within regular course of hospital business).

shows the witness did not know the information sought by the cross-examination.

## VI Admissibility of Photographs Showing the Wounds of the Deceased

During the trial the State was allowed to introduce certain general pictures of the victim and his wounds. Appellant maintains that since she did not contest the commission of the crime the photographs had little, if any, probative value and were merely introduced to inflame the jury. Although the trial judge might have restricted the number of pictures admitted, the question of whether or not the pictures had any probative value or were inflammatory was within the discretion of the trial court. *Eg., Sisk v. State,* 232 Md. 155, 192 A. 2d 108 (1963); *Cranford v. State,* 36 Md. App. 393, 403, 373 A. 2d 984, 989 (1977); *Carroll v. State,* 11 Md. App. 412, 414, 274 A. 2d 677, 678-679, *cert. denied,* 262 Md. 745 (1971). The pictures did show the victim was appellant's husband and thus tended to prove the *corpus delicti.* We see no abuse of discretion here.

## VII The Argument Concerning the Effect of a Recommendation of Mercy

Appellant argues that the judge should have complied with her request to instruct the jury that under Md. Rule 758 e their recommendation for mercy would not be binding on the trial court.[14] She argues that the closing argument of the State's Attorney left the jury with the impression that such an instruction would be binding. We have examined the argument carefully and do not see how the jury possibly could have been misled by the State's Argument. The prosecutor simply informed the jury that if they desired, in view of the psychiatric testimony, to show mercy they could do so by making a recommendation of mercy to the trial judge. There

---

14. Effective July 1, 1977, Rule 758 e is now covered by Md. Rule 759 f.

was no suggestion in the argument that the recommendation would be binding; indeed, if it were a recommendation, by definition it could not be binding.

> *Judgments reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by Montgomery County.*