## GEORGE ANTHONY HARROD *v.* STATE OF MARYLAND

[No. 905, September Term, 1977.]

*Decided April 13, 1978.*

The cause was argued before THOMPSON, WILNER and COUCH, JJ.

*Richard M. Karceski, Assigned Public Defender,* for appellant.

*Gilbert H. Robinette, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Charles P. Lamasa, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Lightning may get away with striking twice in the same place. George Anthony Harrod did not. He was caught and

thereafter convicted by a jury in the Criminal Court of Baltimore of robbery with a deadly weapon, for which he was sentenced to imprisonment for fifteen years, and of using a handgun in the commission of a felony or crime of violence, for which he was sentenced to a concurrent term of five years. We affirm these convictions.

The State's case against Harrod came primarily from the testimony of Clara Stump and Helen Stephenson, two former employees in a store known as the Edsel Shop. This was a children's clothing store located in Baltimore City, near the Johns Hopkins Hospital complex. Essentially, their testimony was that Harrod and another man, thought to be Jeffrey Cassell, entered the store on January 10, 1976, when both women were at work. Harrod pretended to be a customer, and was waited on by Ms. Stump. After examining some items of children's clothing, he (and Cassell) left the store. They returned about ten minutes later and Harrod stated that he would buy the item he had previously examined. Ms. Stump retrieved the article, accepted $20 from Harrod, and was about to place the money in the cash register when Harrod pulled a gun. He then herded Ms. Stump and Ms. Stephenson into the back of the store and locked them in the bathroom. When they finally got out, they found the cash register open and the money ($140) gone. Eighteen dollars was also taken from Ms. Stump's purse.

Shortly after this incident, Ms. Stephenson identified Cassell from an array of photographs shown her by the police, and a warrant was promptly issued for his arrest.[1]

Nothing of consequence happened with respect to Harrod until June 22, 1976, some five months later, when he again entered the Edsel Shop — this time alone — and again held it up at gunpoint. Ms. Stump had the misfortune of being present on this occasion as well. About a month later, on July 19, 1976, Ms. Stump spotted Harrod on the street outside the shop, and observed him enter a nearby jewelry store. She promptly notified the police; and, as a result, Harrod was identified, tracked down, and arrested.

---

1. He was, in fact, arrested on January 21, 1976.

The case proceeded against Harrod only with respect to the first incident — the one occurring on January 10.[2] Cassell was joined as a co-defendant charged with two counts of armed robbery, both, apparently, in connection with the January 10 incident. During the course of the trial, however, the State nol prossed these charges against Cassell, and the trial thenceforth proceeded against Harrod alone.

Further facts will be set forth in the discussion of the issues raised by Harrod. Those issues are as follows:

1. Was appellant precluded from impeaching the witness, Clara Stump, by use of the transcript of her testimony at appellant's preliminary hearing?

2. Was appellant's right to cross-examine State's witnesses on material issues unduly restricted?

3. Was the testimony concerning an alleged admission by appellant to his participation in the instant robbery erroneously admitted in evidence?

4. Was the rebuttal testimony of Officer Timothy Murray improperly admitted in evidence?

5. Did the State fail to meet its burden of proof under the eighth count (use of a handgun in the commission of a felony or crime of violence) and was the trial court's instruction on that count plain error requiring a reversal of appellant's convictions?

(1) *Use of the Preliminary Hearing Transcript*

The complaint here, in appellant's words, is that he was "precluded from impeaching the witness, Clara Stump, by use of the transcript of her testimony at the appellant's preliminary hearing."

During her direct examination, Ms. Stump stated, with respect to the January 10 incident, that *two* men had entered

2. He was charged for his actions in both episodes, but the State seemed to have great difficulty in deciding whether to proceed with the second case. By the time it elected to do so (the morning of trial), defense counsel objected, and the court sustained the objection.

the store. She repeated that on cross-examination. Defense counsel then desired to impeach the credibility of the witness by showing that, at Harrod's preliminary hearing in the District Court, she had testified that *three* men, rather than *two*, had entered the store. He proposed, ultimately, to do this by referring to a transcript of that proceeding which purports to show her saying that "there was three men came in." Counsel began to lay the necessary foundation to establish a prior inconsistent statement when an objection was made to the form of his question. At an ensuing bench conference, the State learned that counsel was in possession of the transcript and proposed to use it for impeachment purposes.

There then ensued, at the bench, a wide-ranging discussion about the transcript. The State objected to the admission of the transcript into evidence primarily on the grounds that the transcript was hearsay, it was unreliable, and it was not properly authenticated. Responding to these objections, the court noted that District Court transcripts tended to be unreliable, and it expressed concern that "you [defense counsel] don't have anybody to vouch for the reliability of this transcript."

Whatever may have been counsel's original proposed use of the transcript, after several bench conferences, it became clear that he desired to offer it, or at least the relevant part of it, into evidence. His ultimate motion was not merely to read the question and answer, as shown in the transcript, to the witness and then ask her about them, but rather to place that part of the transcript into evidence as an exhibit. The court, responding to that motion, allowed the transcript to be marked for identification, but declined to permit the transcript, or any part of it, to be admitted into evidence, stating:

> "[T]he most untrustworthy document I can think of is a District Court transcript made from a disc which is transcribed by a typist who is not a reporter and doesn't even hear the testimony. And it may be covered technically by the law . . . but the byword in

the introduction of any evidence is trustworthiness. And transcripts of District Court hearings are notoriously untrustworthy." [3]

The court did state, however, that it would permit counsel to call as a witness the public defender who was present at the preliminary hearing:

"You could put him on. He could say, 'Yes, I was there,' and tell whether or not he remembers what she said in answer to that. But, now, that's a live witness who was a witness to a prior contradictory statement. But, I'll not accept . . . a District Court transcript to support a position of a prior contradictory statement."

In addressing the issue raised, we start with the proposition that the credibility of a witness may be impeached by showing that he has made statements which contradict his trial testimony in respect to material facts, provided a proper foundation has been laid. *See State v. Kidd,* 281 Md. 32 (footnote 8 at page 46) (1977).[4] This would, of course, include statements made by a witness at a preliminary hearing. *DeToro v. Pepersack,* 332 F. 2d 341 (4th Cir., 1964), *cert. denied* 379 U. S. 909 (1964). Thus, after laying a proper foundation, he was entitled to offer credible evidence that Ms. Stump had stated, at the preliminary hearing, that three people had entered the store.

The question was whether the "transcript" of the hearing was the appropriate vehicle with which to establish that proposition. To address that issue, we first must consider what it is we are dealing with.

In circuit court proceedings, an official court reporter is present in court, and he personally and contemporaneously records his immediate sensory perceptions of what has

---

3. In the course of the discussion, trial counsel admitted that he had not listened to the actual recording of Ms. Stump's testimony. In appellant's brief, appellate counsel candidly and honorably states that he did listen to the recording and that, "after a review of that recording, counsel is of the opinion that Miss Stump may have said that *two* men and *not three* entered the Edsel Shop on January 10, 1976." (Emphasis supplied.)

4. *Cert. denied,* 434 U. S. 1002, 98 S. Ct. 646, 54 L.Ed.2d 498 (1977).

transpired. When he prepares a transcript, he does so from what he personally has recorded; and his transcript represents the only official record of the proceeding.[5] Thus, a court reporter's certificate generally attests both to the recordation and the transcription.[6]

By way of contrast, there are no official court reporters in the District Court. Proceedings there are electronically recorded, not always under the best of circumstances. That recording — the tape or disc — is the actual, and only, neutral and official record of what transpired.[7] When a transcriber prepares a transcript from such a recording, he is therefore not relying on his notes or his recollection, but only upon a recording that he is in no better position than anyone else to interpret.

The primary proposition to be proved was that Ms. Stump had testified, in the District Court, that three men had entered the store. When the transcript purporting to show that was offered, and the State objected that the transcript was unreliable, it raised a secondary issue that had to be dealt with before the primary proposition could be resolved; namely, whether the assertion in that document that Ms. Stump had so testified was itself sufficiently trustworthy to be laid before the jury as substantive evidence. In that context,

---

5. *See* Maryland Rules 826 and 1026 making the transcript of testimony part of the record on appeal; *cf.* Jefferson v. State, 218 Md. 397 (1958).

6. *See* 82 C.J.S. *Stenographers,* § 9. Curiously, there appears to be no general requirement in Maryland that a transcript be certified by the reporter. The only requirement for certification appears to be Rule 33(c) of the Supreme Bench of Baltimore City, requiring the court stenographer to "certify to the completeness and accuracy" of the proceedings. The other seven judicial circuits have not adopted a comparable rule. The trial transcript in this case, in compliance with Supreme Bench Rule 33, is certified both as to recording and transcription.

7. Maryland District Rule 4a requires that "all civil, criminal and traffic trials, preliminary hearings and other oral proceedings before a judge shall be recorded verbatim by a sound recording device provided by the court, *and such recording shall be part of the official record of each proceeding."* (Emphasis supplied.) Maryland District Rule 4c provides that a party shall have access to the sound recording "for the purpose of having such recording replayed or transcribed," under such rules as the Chief Judge of the District Court prescribes. There is, of course, no comparable rule in the Maryland Rules applicable to the circuit courts or the courts of the Supreme Bench of Baltimore. *But see* Maryland District Rule 1326, a rule comparable to Maryland Rules 826 and 1026, requiring, as part of the record in an appeal from the District Court to be heard on the record, a transcript of the testimony in the District Court. Unlike Maryland Rule 1026, Maryland District Rule 1326 does not indicate who is to prepare the transcript.

defense counsel was offering a document for its truth; he was proposing to ask the jury to accept as true the written statement of an out-of-court declarant (the transcriber), not even made on personal knowledge, that Ms. Stump had made a particular statement. And he offered this in lieu of the primary evidence of what she had actually said — the recording from which the transcript was made — or the testimony of a witness who was present at the hearing and could state upon personal knowledge what was said.

It is clear that the document was hearsay. The question is whether it is admissible under any of the available exceptions to the hearsay rule. The only exceptions asserted or even suggested at trial were the statutory "business record" and "public record" exceptions embodied in Md. Annot. Code, Courts article, §§ 10-101 and 10-204. Before dealing specifically with these statutes, however, we note that there is a considerable body of law, in Maryland and elsewhere, concerning the proper ways in which to prove the testimony of a witness given at an earlier proceeding. McCormick offers four such methods; namely: [8]

> "(1) Any *firsthand* observer of the giving of the former testimony may testify to its purport from his unaided memory. . . .
>
> "(2) A firsthand observer may testify to the purport of the former testimony by using a memorandum, such as the judge's, counsel's, or the stenographer's notes, or the stenographer's transcript, to *refresh the present memory* of the witness.
>
> "(3) In most states the magistrate's report of the testimony at a preliminary criminal hearing, and the official stenographer's transcribed notes of the testimony at the trial of a case, civil or criminal, are admitted, when properly authenticated, as evidence of the fact and purport of the former testimony either by statute or under the hearsay exception for

---

8. McCormick on Evidence, 2nd Ed., § 260.

*official written statements.* There is generally no rule of preference for these reports, however, and any observer, including the stenographer himself, may be called to prove the former testimony without producing the official report or transcript.[9]

"(4) A witness who has made written notes or memoranda of the testimony at the time of the former trial, or while the facts were fresh in his recollection, and who will testify that he knows that they are correct may use the notes as memoranda *of past recollection recorded."* (Emphasis in the original.)

It should be carefully noted that only the notes or transcript prepared by a person actually present and in a position to hear the testimony may be used, and then only when authenticated or verified by a live witness subject to cross-examination. The Maryland Court of Appeals has not stepped beyond this cautious approach, but instead has consistently taken a very restrictive view about the use of stenographic transcripts to prove the testimony of a witness given at an earlier proceeding. The precursor of the issue first arose in *Ecker v. McAllister,* 54 Md. 362 (1880). There had been a previous trial in that case, but the judgment had been reversed and a new trial ordered by the Court of Appeals. In the second trial, defendant attempted to impeach the testimony of two witnesses for the plaintiff by showing their testimony at the first trial. He proposed to do this by offering into evidence his own bill of exceptions from the first trial, which apparently contained a statement of what the two witnesses had said. The Court of Appeals concluded that the document was inadmissible, stating, at pages 371 and 372, that "the only proper mode of proving what a witness orally testified to on a former trial is to examine witnesses for that purpose who heard his evidence given."

This clear and direct statement was reaffirmed by the Court in *Herrick v. Swomley,* 56 Md. 439 (1881). The question there was whether notes of evidence given in a case tried in

9. McCormick relies, in part, on Snyder v. Cearfoss, 190 Md. 151 (1948), in support of this statement. *See* McCormick, p. 625, footnote 83.

a Pennsylvania court, certified by an "official stenographer" of that court, were admissible. Relying on *Ecker v. McAllister,* and pointing out that the document was "nothing more than a copy of the notes of evidence taken by a stenographer, appointed for that purpose, for the convenience of the court and members of the bar", the Court concluded that the stenographer's notes were inadmissible.

The guarded view of the Court as to the use of stenographer's notes was expressed again in *M. & C.C. of Balto. v. Biggs,* 132 Md. 113 (1918). There, counsel had been allowed, at a second trial of the case, to read to the jury a stenographic copy of the testimony of a deceased witness who has testified at the first trial. The Court stated:

> "While the testimony of a deceased witness may be proved by the stenographer who took the testimony and who testified from his notes, or by a witness who heard the testimony, *it is not proper to allow counsel to read the jury a copy of the evidence reduced to writing from the stenographer's notes."* (Emphasis supplied.)

The *dicta* in *Biggs* to the effect that prior testimony may be proved by the stenographer, but not, in his absence, from his notes, was made firm in *Holler v. Miller,* 177 Md. 204 (1939). There, at a second trial, the stenographer who recorded the testimony at the first trial was called as a witness to prove, for purposes of impeaching a witness, the testimony of that witness given at the first trial. The stenographer apparently had no independent recollection of the particular testimony at issue, and his original notes had been destroyed. He did, however, have the transcript which he had made from his notes, and "which he knew to be a true extension of his notes"; and he was permitted to read the particular testimony from that transcript. The Court sustained that approach, commenting (with citations omitted) at pages 207 and 208:

> "It is not disputed that relevant admissions of a party made in a former proceeding may be placed in evidence. . . . But on the authority of [*M. & C.C. of*

> *Balto. v. Biggs*] it is denied that they may be introduced directly by a stenographer's transcript of testimony during the course of which the admissions were made. In that case, however, the court held only that an attorney could not merely read what he offered as a transcript. And in the case of *Herrick v. Swomley* . . . the notes of a Pennsylvania stenographer, certified under the Act of Congress, were excluded as not a part of the record which could be introduced in this state without supporting testimony. When, as here, the stenographer himself, by his testimony in court, verifies the transcript as an authentic extension of his notes, the case is different. In addition to the assurance of authenticity afforded by his oath, there is official character in the transcript because the stenographer is appointed by the court, under the authority of a statute, for the very purpose of preserving testimony. . . . It is settled that he may testify from his notes, without reference to independent recollection. . . . And his transcript is only a more convenient form of testimony from his notes. . . . Therefore the fact that the stenographer in this instance had no independent recollection, and was in reality introducing the transcript in evidence, did not render it inadmissible as supposed."

*Snyder v. Cearfoss,* 190 Md. 151, *supra,* relied on by McCormick, did little more than repeat and reaffirm what the Court had said and done in *Holler v. Miller.* The stenographer, who was present and recorded the testimony at the earlier proceeding, authenticated, through her testimony, the transcript that had been made from her notes.

Although Wigmore suggests that, "on principle", a stenographer's notes should be admissible without the authenticating testimony of the stenographer, he recognizes that courts have "generally declined" to permit that in the absence of statutory authorization.[10] Although a number of

---

**10.** 5 Wigmore on Evidence, § 1669 (Chadbourn Revision); *see also* 4 Wigmore, § 1330. This suggestion would not apply, in any case, to the notes of a transcriber who was not himself present in court.

States have enacted such statutes, specifically making certified stenographic transcripts admissible as evidence,[11] it does not appear that Maryland has done so.

Courts article, § 10-101, provides that "a writing or record *made in the regular course of business* as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act . . ." and that "the lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility." (Emphasis supplied.) Subsection (c) of that section, however, provides that "the practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards."

It is not clear, despite Maryland District Rule 1326, that the transcript was made "in the regular course of business". What is crystal clear, both in fact and from Maryland District Rule 4, is that, with respect to the transcript (as compared with the electronic recording) it was *not* the practice of the court to make "such written records of its acts at the time they are done or within a reasonable time afterwards." Indeed, it is not the practice of the court to make these transcripts at all, unless, in the case of a trial (as compared, for example, with a preliminary hearing) there is an appeal from the judgment, or unless a party otherwise asks for a transcription. Accordingly, we conclude that the transcript of the preliminary hearing was not admissible under § 10-101.[12]

Section 10-204 provides that a copy of a "public record, book, paper, or proceeding of any agency of the State" or political subdivision of the State shall be received in evidence in any court "if certified as a true copy by the custodian of the record, book, paper, or proceeding, and if otherwise admissible." This statute, enacted as part of the code revision process, was intended to be an amalgamation of a series of "public records" statutes, each pertaining to a particular

---

11. *See* 5 Wigmore, § 1669, *supra,* footnote 2, for a summary of such statutes.

12. For essentially similar reasons, we do not believe the transcript would be admissible under § 10-102 — the Uniform Photographic Copies of Business and Public Records as Evidence Act.

State agency, that were previously codified in Md. Annot. Code art. 35.[13]

Assuming, *arguendo,* that the transcript in question qualifies as a "copy of a ... proceeding" of a State agency, which we need not decide, it is clear that it was not "certified as a true copy" of that proceeding "by the custodian of the ... proceeding". There was no showing, in the first instance, that the transcriber was the custodian of the "proceeding", or the original disc. Moreover, as the trial judge pointed out, her certificate did *not* state that the transcript was a "true copy", but only that it was the "official transcript" and that she transcribed the disc recording. On its face, therefore, the transcript did not comply with the requirements of the statute.[14]

Accordingly, although counsel could have offered evidence of the alleged prior inconsistent statement in other ways, the transcript itself was inadmissible; and the court therefore committed no error in sustaining the State's objection to it.[15]

### (2) *Restriction of Cross-Examination as to Identification of Cassell*

As noted, the case initially proceeded against both Harrod and his co-defendant Jeffrey Cassell. Ms. Stump, the State's first witness, positively identified Harrod as the man who twice robbed her and the store. With respect to the January 10 incident, she stated that she had not paid much attention to the second man, and was unable to identify Cassell. The

---

**13.** The Revisor's Note states, in relevant part: "This section is new language derived from Article 35, §§ 67 through 82. All of these sections deal with the same subject matter, and the agencies and departments are added from time to time. The proposed revision would bring all governmental agencies under this one section."

**14.** At best, the transcript would be a copy of a copy of a proceeding; and we fail to see how the transcriber could accurately certify the transcript to be an actual "true copy" of the proceeding itself. We note further that the predecessor statutes, from which § 10-204 was derived, were in existence when Holler v. Miller and Snyder v. Cearfoss, both *supra,* were decided.

**15.** *Cf.* Crawford v. State, 282 Md. 210 (1978) affirming 37 Md. App. 1 (1977), in which the transcript of testimony given by a witness at a District Court preliminary hearing was held admissible, where the witness was unavailable at trial. The sole issue addressed by the Court was whether the admission of the testimony violated appellant's right of confrontation. It does not appear that the evidentiary question relevant here was raised or considered.

State's case against Cassell was based primarily on the expected testimony of Ms. Stump's co-worker, Helen Stephenson, who had previously made a positive photographic identification of Cassell.

At the conclusion of Ms. Stump's testimony, but prior to Ms. Stephenson being sworn, the State's Attorney advised the court (and defense counsel) that, during a break in the trial, Ms. Stephenson had stated that "she got a look at Mr. Cassell at the trial table and she said that she was not sure that he was the one." With the consent of defense counsel, a "one on one" confrontation was arranged in the courtroom, outside the presence of the jury. Ms. Stephenson reiterated her uncertainty, stating that Cassell had a darker complexion and was a lot thinner than the second participant in the robbery. The State's Attorney then indicated that he would consider this turn of events overnight.

The next morning, Ms. Stephenson was called to testify. She corroborated Ms. Stump's explanation of what occurred on January 10, and positively identified Harrod as one of the robbers. She said that she paid particular attention to him "because I thought he was a nice looking man." She pointed to Cassell as the man who "looks like" the second robber, but admitted that she was not certain of that identification. It was then established that, in July, 1976, Ms. Stephenson was shown a book of photographs by the police from which she had identified Harrod. She was shown the book again in court and was able to pick out the photograph of Harrod that she had identified in July. She noted that the photograph showed Harrod in a neck brace, or orthopedic collar, and that, in making the July identification, she had pointed out to the police that he had not worn such a collar when he was in the store the previous January.[16]

At the conclusion of her direct examination, the State's Attorney advised that he would "do something" about the Cassell case after the witness completed her testimony.

During cross-examination, defense counsel asked Ms.

---

16. Harrod introduced, as part of his defense, evidence tending to show that he had been injured in June, 1976, and had worn a neck collar in June and July, 1976.

Stephenson about her photographic identification of Harrod. She admitted that, because of the orthopedic collar, her July identification had not been a positive one. Counsel then attempted to question the witness about her photographic identification of Cassell, but was precluded from doing so on the ground that such inquiry exceeded the scope of direct examination. Indeed, on direct examination, she had not been asked about her photographic identification of Cassell. At the conclusion of Ms. Stephenson's testimony, the State nol prossed all charges against Cassell on the apparent ground that its only evidence against him was the uncertain identification by Helen Stephenson.

The State next called Officer Hardgrove, who identified a book of photographs he said he had shown to both Ms. Stump and Ms. Stephenson on July 20. This was the same book that Ms. Stephenson had identified and from which she selected Harrod's photograph. He stated that, from that book, Ms. Stump had positively identified Harrod, but that Ms. Stephenson's identification had been hesitant:

> ". . . she [Stephenson] picked out the photograph of Mr. Harrod but was hesitant. She continued through the book and came back and said, 'Yes, I believe this is the man, but I cannot be absolutely certain.' "

On cross-examination, counsel attempted to ask the officer whether Ms. Stephenson had identified anyone else, to which the State objected. At an ensuing bench conference, it became clear that counsel desired to show that, in January, 1976 (not in July), Ms. Stephenson had positively identified Cassell from a photograph, and that she was unable to identify him in court with such precision. From this, he proposed to attempt to impeach her positive in-court identification of Harrod. The court sustained the objection on the basis that the identification of Cassell in January had not involved Officer Hardgrove and that it was irrelevant.[17]

---

17. Counsel asked if he would be allowed to call as a witness the officer involved in the January identification and the court said no. That ruling has not been argued, and is therefore not before us.

Appellant claims that "regardless of the soundness of his trial tactics," his trial counsel had the right to cross-examine Stephenson and Hardgrove "relative to any out of court identification made by the witness Stephenson."

At first blush, his argument would appear to be justified under the holding of this Court in *DeLilly v. State,* 11 Md. App. 676 (1971). In that case, four men entered the home of Mr. and Mrs. Jackson and literally terrorized the family. Mrs. Jackson was raped by two of the men, her aunt was assaulted, the house was ransacked, and some personal property was stolen. From a number of photographs shown to them shortly after the crime, Mr. and Mrs. Jackson identified DeLilly as one of the men who had entered the home and raped Mrs. Jackson.

At trial, Mr. Jackson made an in-court identification of DeLilly. On cross-examination, he also stated that he had identified one Charles Alston as the other man who had raped his wife. He stated that he had identified Alston from a photograph, at a police line-up, and in court at Alston's earlier trial. He stated that, although his wife had been unable to recognize Alston as one of her assailants, he had no doubt about his identification. *At that point,* with all of this in evidence, defense counsel undertook to show, through further cross-examination, that, during Alston's trial, Mr. Jackson had, in fact, asked the prosecutor to drop the charges against Alston because, despite his earlier identification of the man, *neither he* nor his wife were then positive that Alston had been involved, and that, as a result of this request, the charges against Alston were, in fact, dropped. The purpose of this examination was to impeach the weight and credibility of Jackson's in-court identification of DeLilly.

Mrs. Jackson also testified and made an in-court identification of DeLilly. She denied ever having identified Alston. Counsel attempted to show, through cross-examination, that Mrs. Jackson had made such an identification, but had repudiated it at Alston's trial; but he was precluded from doing so. Counsel, in a further attempt to pursue this point, called Alston's prosecutor as his own

witness, and tried, through him, to show the identification and its subsequent repudiation; but the court blocked that avenue as well.

Reversing the resulting conviction, we stated, at page 680, that:

> "Appellant was attempting to convince the jury, at the least, that because of the Jacksons' uncertainty in connection with the Alston identification, their testimony positively identifying him (appellant) should be viewed as equally lacking in certainty, as not being credible, and, therefore, unworthy of belief. We think *in the circumstances of this case,* the court's limitations upon appellant's efforts to so persuade the jury through cross-examination of the Jacksons, and direct examination of [other witnesses], constituted prejudicial error. . . ."

We pointed out that where the limitations imposed by the court upon cross-examination "are such as plainly inhibit the ability of the accused to obtain a fair trial" the discretion in this regard normally accorded to the trial judge is subject to review. Further, we stated that "under the *Wade-Gilbert-Stovall-Simmons* spate of cases, the full circumstances surrounding the identification of a criminal accused, including other identifications and misidentifications made in the same case which are the product of the same investigation, and made, as here, under similar circumstances, is properly a subject upon which wide latitude should be given the accused in cross-examination." This area of inquiry, we noted, is not limited to matters brought out in direct examination.

The underpinnings of *DeLilly* are, of course, applicable to this case as well. The court erred in not permitting counsel to cross-examine Ms. Stephenson about her earlier photographic identification of Cassell. However, our review of the entire record convinces us, unequivocally, that the error here was harmless beyond a reasonable doubt.

The desired inquiry in *DeLilly* was so germane, and so critical to the defense, and the limitations imposed on that

inquiry were so complete and so severe that the defendant's basic right to a fair trial was affected. The jury was totally precluded from learning about an event that was highly relevant in determining the credibility of the State's key witnesses. No such consideration is present here.

In his opening statement, the State's Attorney told the jury that "Helen Stephenson was able to pick out the photograph of Mr. Cassell as the second person. . . ." When the charges against Cassell were nol prossed, the court advised the jury of that fact, and, indeed, said to the jury by way of explanation:

> "He is out of this case. And I think the reason is obvious from what you have seen here in that, as the case has developed so far, the only witness who could identify . . . the second robber or stickup man was the last witness on the stand . . . Miss Stephenson. And in court here this morning she could not make a positive identification of Mr. Cassell."

Thus, the very information sought to be elicited from Ms. Stephenson (as well as from Officer Hardgrove) was, in fact, made known to the jury in perhaps even more graphic form than had it come from counsel's cross-examination. This jury thus had the information denied to DeLilly's jury, and appellant suffered no harm or prejudice from the court's error in not permitting it to be brought out through the two witnesses.[18]

### (3) Testimony as to Alleged Admission by Appellant

The complaint here is that "testimony concerning an alleged admission by the appellant to his participation in the instant robbery was erroneously admitted in evidence." The background is as follows.

---

18. In light of this conclusion, we need not consider the additional question of whether a proper foundation had been laid for asking Officer Hardgrove, who had testified only as to the photographic identifications in July, 1976, about the circumstances of Ms. Stephenson's photographic identification of Cassell in January, 1976. There was nothing in evidence, at that point, to show that Officer Hardgrove was present at the January identification or was competent to testify about it.

Appellant's wife, Patricia Harrod, testified on behalf of her husband. On direct examination, she admitted going to the Edsel Shop after appellant's arrest and showing Ms. Stump a picture of her husband. She was then asked, "what happened after you showed her the picture?" Before the witness could answer, the State objected "to what Miss Stump said," and the court sustained that objection. Counsel then conferred for a moment with his client, and declined to pursue that line of inquiry any further.

On cross-examination, Mrs. Harrod stated, without objection, that her purpose in going to the store and showing Ms. Stump the photograph was "to see if maybe she had made a mistake." She admitted conversing with Ms. Stump, asking her whether she had been robbed recently, showing her the picture, and asking, "Is this the one that's supposed to have robbed her?" The State's Attorney then asked, over objection, whether she recalled being asked by Ms. Stump, "Who told you he robbed the store", to which the witness replied that she did not remember. The State's Attorney thereupon asked, *without objection,* "You remember saying, 'He told me he robbed the store?' ", to which she replied "No." Twice more, without objection, Mrs. Harrod was asked whether she had told Ms. Stump that appellant had told her (Mrs. Harrod) that he had robbed the store, and both times she denied making such a statement.

The State thereafter recalled Ms. Stump on rebuttal. She was asked about the conversation with Mrs. Harrod, and, over objection, stated that Mrs. Harrod had told her that "her husband had told her" that he had robbed the store. Counsel's objection to that question was solely on hearsay grounds. The court overruled the objection on the theory that this was merely an attempt to impeach the credibility of Mrs. Harrod by showing that she had made a prior statement that was inconsistent with her trial testimony.

In order to rebut Ms. Stump's assertion, defense counsel recalled Mrs. Harrod on surrebuttal. She again denied ever telling Ms. Stump that her husband (appellant) had admitted robbing the store, although she conceded that she told Ms. Stump that appellant had been arrested for the crime.

The whole subject matter of appellant's alleged admission was introduced during the cross-examination of Mrs. Harrod. The inquiry there clearly exceeded the scope of direct examination, particularly in view of the court's refusal to permit the witness to testify as to any remarks by Ms. Stump. Unfortunately for appellant, however, no objection was made to the particular questions concerning that admission, and Mrs. Harrod's persistent denials that she ever made such a statement thus came into evidence without objection. In that circumstance, it was not inappropriate for the State to attempt to impeach the credibility of the witness by offering evidence that she had indeed made such a statement. The rebuttal testimony of Ms. Stump was solely for that purpose — to establish a prior inconsistent statement on the part of Mrs. Harrod.

The rebuttal testimony of Ms. Stump was objected to solely on the ground that it was hearsay, or, as trial counsel characterized it, double hearsay. Counsel, however, misperceived what was being offered and why it was being offered. It was not Mr. Harrod's alleged admission to his wife that was being offered at that point. Nor were Mrs. Harrod's alleged statements to Ms. Stump being offered for their truth. All that was being offered on rebuttal was the assertion by Ms. Stump that Mrs. Harrod had made that statement to her, and that it was inconsistent with her trial testimony. Notwithstanding that it was hearsay and would have been inadmissible as substantive evidence, the statement was clearly admissible for the limited purpose of impeachment. *See Sun Cab Company v. Cusick, Inc.,* 209 Md. 354 (1956); *Joppy v. Hopkins,* 231 Md. 52 (1963); McCormick, *supra,* § 34.

### (4) *Rebuttal Testimony of Officer Murray*

Appellant complains here about the testimony of a police officer called as a rebuttal witness to show that appellant was not disabled, as, through his witnesses he had claimed to be, at or about the time of the robbery. Suffice it to say that no objection was offered to such testimony, nor was a motion made to strike it. We therefore decline to consider that question. Maryland Rule 1085.

### (5) *Handgun Conviction*

Appellant contends that the evidence was insufficient to sustain his conviction on the eighth count of the Information — use of a handgun in the commission of a felony or crime of violence. The testimony of Ms. Stump was more than adequate to sustain the conviction. *Couplin v. State,* 37 Md. App. 567 (1977), *cert. denied* 281 Md. 735.[19] He claims also that the court's instruction to the jury was erroneous. However, he failed to except to the instruction, and we will therefore not consider it. Maryland Rules 757h. and 1085.

*Judgments affirmed; appellant to pay the costs.*

---

**19.** The Court of Appeals denied certiorari January 4, 1978.