878 A.2d 604

**Gregorio Isasi GONZALEZ**

v.

**STATE of Maryland.**

**No. 103, Sept. Term, 2004.**

Court of Appeals of Maryland.

July 15, 2005.

Stanley E. Baritz, Rockville, for petitioner.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

Petitioner, Gregorio Gonzalez, was convicted in the District Court of second degree assault, based largely on testimony that, while performing a massage treatment on a customer, Ms. Crane, he inserted his finger into her vagina. Gonzalez noted an appeal to the Circuit Court for Montgomery County where, in accordance with Maryland Code, § 12–401(f) and (g) of the Cts. & Jud. Proc. Article (CJP), he received a *de novo* trial before a jury.

During the Circuit Court proceeding, Gonzalez wished to impeach the testimony of Ms. Crane by showing that, in one respect, she testified differently in the District Court. Because, as the result of an equipment malfunction, the proceedings in the District Court were not recorded, Gonzalez summoned two persons who were present during Ms. Crane's testimony in the District Court—the interpreter appointed to assist Gonzalez and the District Court bailiff—to recount her

testimony in the District Court. After a *voir dire* examination of one of the two witnesses, the court refused to allow them to testify, whereupon Gonzalez moved for a mistrial. When that motion was denied, he attempted to withdraw the appeal, which the court refused to permit him to do. The jury convicted Gonzalez of the second degree assault, and the court imposed a sentence more severe than that imposed in the District Court.

Following an inappropriate appeal to the Court of Special Appeals and a transfer of that appeal to this Court, we granted *certiorari* to consider two questions: (1) whether the Circuit Court erred in refusing to permit the interpreter and the bailiff to testify as to Ms. Crane's testimony in the District Court, and (2) whether it also erred in refusing to permit Gonzalez to withdraw his appeal and allow the District Court judgment to stand. We need address only the first issue, which we shall find dispositive, although we shall ask the Court's Standing Committee on Rules of Practice and Procedure to review Maryland Rule 7–112(f)(1) with respect to the second.

## BACKGROUND

Gonzalez was employed as a shampoo assistant at a hair salon in Bethesda. While living in Argentina, he had been trained and certified in massage therapy, but he was not certified as a massage therapist in Maryland.[1] Apparently as a result of his incorporating neck, shoulder, and arm massages as part of his shampooing, however, one of the salon's patrons, Ms. Russell, purchased a gift certificate from him for a one-hour massage. Ms. Russell gave the certificate to her brother-in-law, Mr. Crane, as a birthday present. When Mr. Crane's wife, who was also a customer of the salon and had

---

1.  Maryland Code, § 3–5A–05 of the Health Occupations Article requires a person to be certified by the State Board of Chiropractic Examiners before practicing massage therapy in Maryland. That section requires a person to be registered by the Board before practicing non-therapeutic massage in the State.

had her neck, shoulders, and arms massaged by Gonzalez during a shampoo, found out about the gift certificate, she scheduled an additional full-body massage for herself, both massages to take place at her home on September 13, 2003.

Ms. Crane had her massage first. During the massage, which occurred in Ms. Crane's bedroom, Gonzalez allegedly inserted his finger into Ms. Crane's vagina. She immediately jumped off the table and, wrapped only in the sheet that was covering her during the massage, ran downstairs and complained to her husband, who ordered Gonzalez to leave. As her husband ran upstairs to confront Gonzalez, Ms. Crane, still clad only in the sheet, ran to a neighbor's house and reported the event to the neighbor.

At some point during the following week, Ms. Crane called a friend who was a sergeant at the Bethesda police department for some informal advice and, with that advice, then formally notified the police of the incident. She also informed the owner of the salon, although the sequence of the reports to the police and the owner of the salon is in dispute and underlies the central issue now before us. As a result of her complaint to the owner of the salon, Gonzalez was discharged from his employment. As a result of her report to the police, Gonzalez was charged in the District Court with second degree assault (Maryland Code, § 3–203 of the Criminal Law Article) and misrepresenting himself as a massage therapist (Maryland Code, § 3–5A–11(b) of the Health Occupations Article).

Trial in the District Court occurred on November 13, 2003. Although Gonzalez speaks English, that is not his native tongue, and so, at his request, a Spanish interpreter, Ester Davis, was provided for him. Unfortunately, a malfunction of the recording equipment in the court that day led to none of the trial being recorded. Ms. Davis later testified in the Circuit Court that five witnesses testified at the District Court proceeding—Ms. Crane, Mr. Crane, Ms. Russell, Gonzalez, and Gonzalez's wife. The District Court acquitted Gonzalez of misrepresenting himself to be a massage therapist but convicted him of second degree assault and sentenced him to 180

days incarceration, all of which was suspended, a $500 fine, half of which was suspended, and one year of supervised probation.

Gonzalez noted an appeal to the Circuit Court for Montgomery County and elected a jury trial. The first witness was Ms. Crane, who testified to her version of what had occurred. On cross-examination, she was asked how long after the incident she waited to report it to the police and whether her report to the police occurred before or after she complained to the owner of the salon. Ms. Crane responded that she called her friend, the sergeant, the day after the incident, that she made a formal report to the police the following day (two days after the incident), and that she did not complain to the salon owner until after Gonzalez was arrested. She was very precise on that point. She said that the police had advised her not to talk with anyone at the salon until they obtained a warrant and that she did not go to the salon until seven days later. When asked whether she had testified in the District Court that she and Ms. Russell had gone to the salon three days after the incident, she responded "I 100 percent did not testify to that because that didn't happen."

After presenting testimony from Mr. Crane and from the neighbor, the State rested. Gonzalez, his wife, and the owner of the salon then testified for the defense. At the conclusion of that testimony, defense counsel called Ms. Davis, the person who had served as interpreter in the District Court, as a witness, to testify as to what Ms. Crane said at the District Court trial with respect to the sequence of her reports to the police and the owner of the salon. Counsel averred that Ms. Crane's testimony there differed from that in the Circuit Court and that Ms. Davis would be an impeachment witness. Specifically, he proffered that she would testify that she remembered Ms. Crane's testimony and that Ms. Crane testified in District Court that she went to the salon before she went to the police. Counsel also advised that he intended to call the District Court bailiff for the same purpose. The prosecutor, noting that neither witness had been disclosed, objected on the ground that it was improper to call a person

who served as interpreter as a witness and that her recollection of what occurred would be irrelevant in any event.

The court wanted to determine the extent of their respective recollections before allowing the interpreter or the bailiff to testify and, during the jury's lunch break, subjected Ms. Davis to *voir dire* examination. The court never questioned the bailiff. Ms. Davis confirmed that she had interpreted for Gonzalez in the District Court, that she was present when Ms. Crane testified, and that Ms. Crane had stated that "a few days" after the incident, she and her sister went to the salon and complained to the owner and that she went to the police "sometime later." Ms. Davis was not certain whether Ms. Crane claimed that she went to the police the same day as she went to the salon but was certain that she testified that she went to the salon first.[2] She confirmed on cross-examination that "I do remember how she testified. I know the words she said when she described the incident and what happened after the incident."

The court expressed skepticism as to how that was impeachment evidence and eventually disallowed testimony by either Ms. Davis or the bailiff on the ground that it was a "red herring" and "fundamentally unfair." The court seemed concerned that Ms. Davis did not have a verbatim recollection or any documentation of Ms. Crane's testimony and treated the matter as simply Ms. Davis and Ms. Crane having different recollections. It ruled: "If you have a witness that will give definitive testimony, absolutely certain that is what was said, I will allow it. But not a witness who comes in here and says as best as I can remember this is what the witness said. That is fundamentally unfair."

---

2. Her statement in that regard was as follows:
"Q: But you're sure that she testified that she went to the employer first?
A: Yes.
Q: And then to the police?
A: Yes."

Faced with that ruling and complaining as well about the earlier admission of a document, counsel moved for a mistrial. When that was denied, he indicated that he wanted to withdraw the appeal and asserted that, under Maryland Rule 7–112(f), Gonzalez had the right to withdraw his appeal at any time. The Rule, in its relevant part, actually provides that "(1) An appeal shall be considered withdrawn if the appellant files a notice withdrawing the appeal or fails to appear as required for trial or any other proceeding on the appeal [and] (2) Upon a withdrawal of the appeal, the circuit court shall dismiss the appeal, and the clerk shall promptly return the file to the District Court." The Rule does not, at least facially, set a time deadline on when an appeal may be withdrawn, specifically whether it may be withdrawn after the case is called in the Circuit Court, or a jury is sworn, or evidence is presented, or the State rests, or the case is submitted for decision to the judge or jury, or even after a verdict is rendered.

The court responded that the Rule did not permit a withdrawal of the appeal after the issues had been joined, a jury selected, and evidence taken. It considered counsel's request as a motion to dismiss the appeal and denied the motion. The case was then presented to the jury which, as noted, found Gonzalez guilty of second degree assault. During closing arguments, the prosecutor stressed Ms. Crane's credibility. Upon the verdict, the court sentenced Gonzalez to five years incarceration, all of which was suspended, a fine of $2,500, and three years of supervised probation, and also ordered that he submit to examination and treatment by a specified therapist.

## DISCUSSION

The thrust of Gonzalez's argument with respect to the disallowance of testimony by Ms. Davis and the bailiff is that (1) the credibility of Ms. Crane was central to the State's case, as Gonzalez denied ever inserting his finger into her vagina or engaging in any other sexual or assaultive conduct, (2) Ms. Davis and the bailiff would have impeached her credibility by showing that she gave testimony in the District Court, in the same case, that was markedly different from that which she

gave in the Circuit Court, at least as to the sequence of her reports, and (3) the inability of those witnesses to recall precisely the verbatim testimony given by Ms. Crane went only to their credibility, not to their competence as witnesses, and that credibility was for the jury, not the judge, to resolve. The State responds that the court's disallowance of their testimony was not based on its assessment of their credibility but rather its conclusion that there was an insufficient foundation for their testimony. In that regard, the State relies largely on the discretion accorded to trial judges in the overall conduct of a trial.

Whether we view the court's ruling as founded on lack of credibility or lack of foundation is unimportant. It seems clear, from what the court said, that it adopted the view that a person—a proposed witness—is not allowed to recount prior testimony by another person, given in the proposed witness's presence and however relevant that evidence may be, unless the proposed witness has either an essentially verbatim recollection of the prior testimony to be recounted or some documentation of it that the court finds adequate. That is not the law.

 It is, of course, undisputed that the credibility of a witness may be impeached by showing that the witness has made statements which contradict the witness's trial testimony as to material facts, provided a proper foundation has been established. *See Stewart v. State*, 342 Md. 230, 236, 674 A.2d 944, 947 (1996). That includes statements made by the witness in the form of testimony at a prior judicial proceeding. The issue here is one of method—how and under what circumstances may such inconsistent statements made in the form of testimony given during an earlier judicial proceeding be proved? This Court and the Court of Special Appeals have dealt with that issue, sometimes in the context of proving former testimony for impeachment purposes and sometimes to establish the testimony of a witness who died prior to the second proceeding.

In *Ecker v. McAllister*, 54 Md. 362 (1880), a defendant attempted to impeach the testimony of two witnesses for the plaintiff by showing inconsistent testimony on their part at a prior trial in the case. He proposed to prove the inconsistent testimony by offering into evidence his own bill of exceptions from the first trial, which purported to recite the testimony given by those witnesses. Noting that the document was neither written nor signed by the witnesses whose testimony it purported to contain, that it was prepared by counsel, and "for aught we know, may have contained but a part of the testimony given," this Court held the document inadmissible and announced that "[t]he only proper mode of proving what a witness orally testified to on a former trial is to examine witnesses for that purpose who heard his evidence given." *Id.* at 371–72.[3] That statement was quoted and confirmed a year later in *Herrick v. Swomley*, 56 Md. 439 (1881), where this Court held inadmissible a certified copy of "notes of evidence" made by a court stenographer in an earlier case tried in Pennsylvania.

The *Ecker/Herrick* rule had been given some elasticity in *Waters v. Waters*, 35 Md. 531 (1872). The Court, though confirming that the testimony of a deceased person given at a former trial could not be proved by the notes of such testimony prepared by one of the attorneys present at the trial, concluded that it was permissible for the attorney, sworn as a witness, to refresh his memory by consulting his notes "and then to state what recollection he had of the testimony given by the deceased witness after he had read the notes." *Id.* at 539 (internal quotations omitted).

---

3. Compare 5 WIGMORE ON EVIDENCE § 1668 (Chadbourn ed. 1974). Wigmore notes a conflict on the matter but concludes that "[t]he majority of courts, on one ground or another, receive the bill [of exceptions] to prove the tenor of the former testimony," citing Nineteenth and early Twentieth Century cases from 15 States. One of the bases for admission was the frequent local practice of requiring the trial judge to sign the bill of exceptions, thereby making the bill somewhat in the nature of a public record.

We can take judicial notice of the fact that there was no electronic—audio or video—recording of court proceedings when those cases were decided, and, although court stenographers, employed to make verbatim recordings of court proceedings, did exist in two of the civil courts in Baltimore City at the time, their employment elsewhere came later.[4] Absent the employment of a stenographer to make a verbatim record, the only written evidence likely to be available of what occurred was in the form of notes made by the judge or someone else present that summarized, in varying detail and for varying purposes, some or all of the testimony by the witnesses and other aspects of the proceeding. In that setting, the Court's view that prior testimony could be proved only by testimony from someone who was present and heard it was understandable and made sense.

In later cases, this Court and the Court of Special Appeals broadened that view somewhat to take account of the availability of stenographic transcripts. In *Mayor & City Council of Baltimore v. Biggs*, 132 Md. 113, 103 A. 426 (1918), the trial court allowed counsel, in a second trial in the case following a

---

4.  Although the reporting of judicial proceedings has a long history—the trial of Socrates being a prime example—officially-appointed verbatim court reporters did not appear in the United States until the 1860's. In 1864, the General Assembly authorized the judge of the Superior Court of Baltimore City to employ a stenographer "to take down testimony in trials before said court." *See* 1864 Md. Laws, ch. 280. In 1867, that authority was extended to the Court of Common Pleas in Baltimore. The duty of the stenographers in both courts was "to take full stenographic notes of all oral testimony and judicial opinions orally delivered in every trial at the regular terms thereof." *See* 1867 Md. Laws, ch. 373. Over the next forty years, the Legislature authorized other circuit courts in the State to employ stenographers for the same purpose. *See,* for example, 1888 Md. Laws, ch. 363 (Frederick County); 1896 Md. Laws, ch. 183 (Carroll County); 1896 Md. Laws, ch. 299 (five Eastern Shore counties); 1908 Md. Laws, ch. 437 (four Eastern Shore counties). Until stenotype machines came on the scene in the first two decades of the Twentieth Century, proceedings were recorded in shorthand, a method that, with some court reporters, lasted into the 1960's. Three principal systems of court reporting are now used in Maryland: computer-assisted stenographic or stenotype machines operated by court reporters; audio recording; and, in at least one Circuit Court, video recording.

reversal of the initial judgment, to read "a stenographic copy of the testimony of a deceased witness who testified at the first trial." *Id.* at 120, 103 A. at 428 (internal quotations omitted). Although, in light of appellant's admission that his exception was "not important" this Court indicated that it would not reverse the judgment on that ground, the Court largely reaffirmed what it had said in *Ecker* and *Herrick:* "While the testimony of a deceased witness may be proved by the stenographer who took the testimony and who testified from his notes, or by a witness who heard the testimony, it is not proper to allow counsel to read to the jury a copy of the evidence reduced to writing from the stenographic notes." *Id.*

In *Holler v. Miller*, 177 Md. 204, 9 A.2d 250 (1939) the plaintiff wanted to prove the testimony of a defendant given in another case involving the same incident. She called the court stenographer from that case, who stated that his notes had been destroyed and that he had no personal recollection of the testimony given, but the court allowed him to read the testimony from a transcript that he had made from his notes. The defendant objected on the grounds that the testimony recounted by the stenographer was not all of the testimony given by the witness and that the stenographer was not using the transcript to refresh his recollection but was essentially using it as an exhibit. This Court found no error. Distinguishing both *Herrick* and *Biggs,* the Court held:

"When, as here, the stenographer himself, by his testimony in court, verifies the transcript as an authentic extension of his notes, the case is different. In addition to the assurance of authenticity afforded by his oath, there is official character in the transcript because the stenographer is appointed by the court, under the authority of a statute for the very purpose of preserving testimony.... It is settled that he may testify from his notes, without reference to independent recollection.... And his transcript is only a more convenient form of testimony from his notes.... Therefore the fact that the stenographer in this instance had no independent recollection, and was in reality introducing the tran-

script in evidence, did not render it inadmissible as supposed."

*Holler, supra,* 177 Md. at 208, 9 A.2d at 251–52 (citations omitted).

*Snyder v. Cearfoss,* 190 Md. 151, 57 A.2d 786 (1948) also involved testimony by an official court stenographer who read from a transcript prepared from her notes. Citing *Biggs* and *Holler,* this Court confirmed that a stenographer may testify from his/her notes without reference to independent recollection. In *Bryant v. State,* 207 Md. 565, 587, 115 A.2d 502, 512 (1955), the Court repeated that, if a party desires to call a witness to recount testimony given by an absent witness at an earlier proceeding, it is necessary that "the person by whom the testimony of the absent witness is sought to be reproduced will state under oath that he heard, remembers, and can relate the substance of all the testimony of such absent witness, or at least the substance of all such testimony on the particular subject sought to be proved."

The latest Maryland cases addressing this issue are *Harrod v. State,* 39 Md.App. 230, 384 A.2d 753 (1978), *cert. denied,* 283 Md. 733, and *Hadid v. Alexander,* 55 Md.App. 344, 462 A.2d 1216 (1983), *cert. denied,* 297 Md. 310. *Harrod* involved an attempt to impeach a trial witness by showing inconsistent testimony given at a District Court preliminary hearing. Counsel for the defendant offered a transcript made of that testimony, that he had in his possession. The trial court refused to admit the transcript, noting, with reference to the recording system used in the District Court at the time, that District Court transcripts tended to be unreliable and that " 'you don't have anybody to vouch for the reliability of this transcript.' " *Harrod, supra,* 39 Md.App. at 234, 384 A.2d at 756–57. The court said that it would permit counsel to call the public defender who was present at the preliminary hearing and question him whether he remembered what the witness said.

As an introduction to its analysis of the issue, the *Harrod* court observed that McCormick offered four ways in which the

testimony of a witness given at an earlier proceeding may be proved:

"(1) Any *firsthand* observer of the giving of the former testimony may testify to its purport from his unaided memory. . . .

(2) A firsthand observer may testify to the purport of the former testimony by using a memorandum, such as the judge's counsel's, or the stenographer's notes, or the stenographer's transcript, to *refresh the present memory* of the witness.

(3) In most states the magistrate's report of the testimony at a preliminary hearing, and the official stenographer's transcribed notes of the testimony at the trial of a case, civil or criminal, are admitted, when properly authenticated, as evidence of the fact and purport of the former testimony either by statute or under the hearsay exception for *official written statements.* There is generally no rule of preference for these reports, however, and any observer, including the stenographer himself, may be called to prove the former testimony without producing the official report or transcript.

(4) A witness who has made written notes or memoranda of the testimony at the time of the former trial, or while the facts were fresh in his recollection, and who will testify that he knows that they are correct may use the notes as memoranda *of past recollection recorded."* (Emphasis in original).

*Harrod, supra,* 39 Md.App. at 237–38, 384 A.2d at 758–59, quoting McCormick on Evidence § 260 (Cleary ed., 2nd ed., 1972). As noted above, at least the first, second, and fourth of those methods have been approved by this Court over the years.

The *Harrod* court concluded, with respect to notes or transcripts, that "only the notes or transcript prepared by a person actually present and in a position to hear the testimony may be used, and then only when authenticated or verified by a live witness subject to cross-examination" and that the Court

of Appeals "has not stepped beyond this cautious approach ..." *Harrod, supra,* 39 Md.App. at 238, 384 A.2d at 759. On that premise and observing that (1) District Court transcripts were not prepared by the person who was present in court or who ever had any personal knowledge of what transpired, (2) it was not the regular practice of the District Court to make such transcripts at the time of the event but rather, upon request, to send a disc to a contract stenographer to transcribe what was on the disc, and (3) there was no certificate by the stenographer that the transcript was a true copy of what was said but only that the stenographer had transcribed the disc recording and that it was an "official" transcript, the court held the transcript inadmissible.

*Hadid* was a mere confirmation of *Harrod.* The trial court admitted into evidence uncertified, unauthenticated transcripts, of a District Court proceeding. The Court of Special Appeals, citing *Harrod,* reversed, holding that "[u]nder Maryland law, it is well settled that a court may not admit into evidence a transcript of proceedings when the transcript does not contain a certificate that it is a true copy." *Hadid, supra,* 55 Md.App. at 354, 462 A.2d at 1222.

The current version of McCormick is nearly identical to that quoted from an earlier edition by the *Harrod* court. *See* 2 MCCORMICK ON EVIDENCE § 307 (Strong ed., 5th ed., 1999). Wigmore, in a more dated analysis, treats the matter in two separate portions of his 1972 ten-volume work—in the part on Provisional Testimonial Preferences, 4 WIGMORE ON EVIDENCE § 1330 (Chadbourn ed.1972), and in the part dealing with Official Statements, 5 WIGMORE ON EVIDENCE §§ 1666–1669 (Chadbourn ed.1972). The portion relevant here is in § 1330, where Wigmore notes that, because it was never the practice *at common law* for any person to be required, or even authorized, by law to record the testimony of witnesses, there was no preferred witness in proving testimony given at a former trial, "so that anyone who heard it may testify from recollection, with or without the aid ... of written notes." Wigmore acknowledges that the report of a stenographer is more trustworthy in the ordinary case than the mere recollec-

tion of a witness, but eschews for practical reasons regarding such a report as preferred evidence.

All of this brings us to the conclusion that, although with the advent of official court stenographers/reporters, the seemingly exclusive method of proving testimony given at an earlier trial enunciated in *Ecker* and *Herrick*, as earlier tweaked in *Waters*, has been expanded somewhat to allow such testimony to be proved from certified transcripts prepared by those stenographers or from authenticated notes or stenotype recordings made by them, the method approved in those early cases has not been abrogated and remains viable. Any competent witness who was present at the former trial, heard the testimony to be recounted, and has a sufficient recollection of that testimony may testify as to what was said.[5] It is undisputed that the interpreter and the bailiff were present in the District Court and heard Ms. Crane's testimony. The question is whether they had a sufficient recollection of what Ms. Crane said in order to be reliably able to recount it. That issue, too, has been considered by this Court on a number of occasions.

In the late Eighteenth and early Nineteenth Centuries, two different rules developed regarding the nature of the testimony required to prove the former testimony of another. In *The King v. Joliffe*, 4 T.R. 285, 290, 100 Eng. Rep. 1022, 1024 (K.B.1791), Lord Kenyon noted, in passing, that in an earlier case involving Lord Palmerston, an attempt to recount not the actual words use by Palmerston but "merely to swear to the

---

5.  We need not address here whether any further expansion, beyond that allowed in the cited cases, is desirable. The District Court and several of the circuit courts now use an audio system to record proceedings, and at least one circuit court uses video recording. Transcripts are prepared on request from the audio or videotapes rather than from any court stenographer's notes. *See* Maryland Rules 16-404, 16-405, 16-406, 16-504, and 8-415. Although those recording systems may not, and hopefully do not, present the same reliability problems noted in *Harrod*, it remains the case that transcripts prepared from the tapes are usually prepared by persons who were not in court and have no personal knowledge of what occurred in court. They can only certify the accuracy of their transcription from the tapes and not the accuracy of the tapes themselves. We reserve for now whether the result reached in *Harrod* will need to be revisited.

effect of them" was rejected. From that developed the rule that strict precision was required—that the actual testimony in the earlier case, the very words used by the witness, must be proved. Wigmore observes that such precision was not required in England prior to *Joliffe,* that such a requirement did not survive very long even after *Joliffe,* but that the case engendered debate in the United States. *See* WIGMORE ON EVIDENCE § 2098 (1972). He points out that the "better view"—not requiring a verbatim recitation—"finally prevailed everywhere; the general principle that verbal precision was not necessary, and that the substance or effect would suffice, came to be accepted as the sound one; and the contrary rule now survives only in one or two jurisdictions bound by early decisions—decisions which are gradually being whittled away so as to leave at least an endurable and not wholly impractical rule." *Id.*

This Court never subscribed to the restrictive view so casually noted by Lord Kenyon. It was implicitly rejected in *Bowie v. O'Neale,* 5 H. & J. 226, 231 (1821) and was expressly rejected in *Garrott v. Johnson,* 11 G. & J. 173, 183 (1840). The *Garrott* Court noted that, in England, "the very words of the deceased witness must be proved, or the testimony is not admissible," but that, in some of the American States, that was not the case. The Court concluded that "the rule as established in England is too rigid, and exclusive for the purposes of justice; and would in most cases, considering the frailty of the human memory, lead to a total rejection of all such testimony," but that to admit merely the "substance" of the testimony would "open too wide a door for a safe and due administration of justice." *Id.* at 183 (italics deleted). We adopted, instead, a middle ground:

"[W]here it is necessary to prove what a deceased witness swore upon a former trial between the same parties, where the issue or matter in controversy was the same, and the one then pending, it is sufficient for the living witness who is called to testify, to prove facts, that is to say, that the witness who is dead, in giving in his testimony, deposed to certain facts. Such a rule would be sufficiently restrictive,

to exclude the opinion and construction of the witness on the one hand, and not so rigid, as to deprive a party in many instances of the benefit of such testimony on the other." *Id.*

Applying that standard, the *Garrott* Court concluded, as had the *Bowie* Court nineteen years earlier, that, although the witness who was present at the earlier proceeding "could not undertake to state the words, or the precise language of the deceased witness in giving his testimony," it was permissible for the trial witness to recount the facts testified to by the deceased witness. *Id.* at 183–84.

Although the precise words need not be recounted, this Court has required that the trial witness be able to recollect the entire testimony given, at least on the issue to which the evidence is relevant. In *Black v. Woodrow*, 39 Md. 194 (1874), a witness at an earlier trial had testified as to the quality and condition of certain lumber at a particular place and as to the different qualities of pine grown in North Carolina and Georgia, both of which were relevant to the issue in the case. At a subsequent trial, after the witness had died, the defendant proposed to testify that he was present at the former trial, heard the testimony of the deceased witness, and could state substantially what that witness had said as to the quality of the lumber at the particular place but could not state substantially what the witness had said about the lumber grown in North Carolina and Georgia.

This Court affirmed the disallowance of that testimony, on two grounds. First, the Court said, to be competent to testify as to the deceased witness's testimony, the witness, though not required to recount that testimony verbatim, must be able to testify as to all of the facts stated by the deceased witness, on direct and cross-examination, not just what the witness "supposes to be its effect or construction." *Id.* at 220. The witness cannot recite just the part favorable to him/her. The Court noted that this general rule requiring all of the testimony to be stated "may have exceptions in cases where there were several and distinct issues, involving distinct subject-

matters, in reference to which the deceased witness testified," but that was not the case in *Black*. *Id.* at 221. Second, the Court confirmed that simply testifying as to "the substance" of the testimony did not suffice; the recounting must be of "the facts" to which the witness testified.[6]

Perhaps because of the prevalence throughout most of the Twentieth Century of transcripts prepared and certified as accurate by official court reporters, there has been little or no occasion to resort to calling witnesses to recount testimony given in earlier proceedings and thus we have not been called upon to revisit this old line of cases, some of which are 100 to 150 years old. When, as here, the court reporting system fails and the parties are left to the ancient device of proving earlier testimony through witnesses who heard it, we are back to where we were in those earlier times. The principles that we enunciated and applied in those old cases still are valid. If the witness was present at the earlier proceeding, heard what was said, and can remember the facts testified to—all of the facts relevant to the point at issue—the witness may recount those facts, even if he/she does not have a verbatim recollection of the testimony. McCormick continues to support that view. The first method of proof that he finds acceptable, in relevant part, is as follows:

"Any firsthand observer of the giving of the former testimony may testify to what was said from *unaided memory*. This and the next method were frequently used before court

---

6. This view, at least in articulation, is narrower than the one that we have taken in regard to the recounting of oral utterances generally. In *Edwards v. State*, 198 Md. 132, 146, 81 A.2d 631, 637 (1951), involving testimony by a prison guard as to a conversation he overheard between two prisoners, we held:

"It is a universally accepted rule that in proving oral utterances verbal precision is not required, but the substance or effect is sufficient. The reason for the rule is that the importance of single words in oral discourse is comparatively much less than in writings, and memory does not retain precise words except of simple utterances and for a short time." (Citations omitted).

We are not asked in this case to expand or re-articulate the principles we have applied to former testimony to match those articulated in *Edwards*.

stenographers became commonplace. The reporting witness need not profess to be able to give the exact words of the former witness but must satisfy the court that he or she is able to give substance of all that the former witness has said, both on direct and cross-examination, about the subject matter relevant to the present suit."

McCORMICK ON EVIDENCE § 307 (1999).

That test was certainly met in this case. Ms. Davis made clear that she recalled, with certainty, Ms. Crane testifying that she went to the salon before going to the police. That was the point of the conflict. Any imprecision as to how many days may have elapsed between the two reports, assuming that Ms. Crane ever testified to that in the District Court, went at best to the credibility of her testimony, not her competence to testify. The responses Ms. Davis gave to the *voir dire* questioning provided an ample basis for allowing her testimony. No *voir dire* was undertaken with respect to the bailiff, but it seemed to be accepted that his recollection was about the same as that of Ms. Davis's. The court erred in refusing to let them testify. It was not within the court's discretion to deny Gonzalez the opportunity to present relevant, non-cumulative evidence in support of his defense, including evidence that might impeach the credibility of the chief witness against him.

**JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR A NEW TRIAL; COSTS TO BE PAID BY MONTGOMERY COUNTY.**